**CIRCUIT CITY STORES, INC., Plaintiff,**

v.

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Defendant.**

No. 3:97CV00538.

United States District Court, E.D. Virginia, Richmond Division.

Aug. 12, 1999.

David E. Nagle, Ellen Duffy McKay, LeClair Ryan, Richmond, VA, for Plaintiff.

Gerald M. Goldstein, Office of Legal Counsel, Equal Employment Opportunity Commission, Washington, DC, Debra J. Prillaman, United States Attorney's Office, Richmond, VA, Daniel Bensing, U.S. Department of Justice, Washington, DC, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

This declaratory judgment action has its genesis in the decisions of the Equal Employment Opportunity Commission ("EEOC") (1) to reform what it perceived to be the law created by the decision of the Supreme Court of the United States in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) and its progeny in the federal courts; and (2) to foreclose the use by employers, in the wake of *Gilmer*, of employment agreements requiring the mandatory arbitration of claims arising under the federal employment discrimination laws enforced by the EEOC. For the reasons which follow, the Court concludes that there is no jurisdiction over the subject matter of this action, notwithstanding the unreasonable and capricious conduct of the EEOC and the serious adverse consequences of that conduct to the plaintiff, Circuit City Stores, Inc. ("Circuit City").

## BACKGROUND

This declaratory judgment action was filed by Circuit City on July 18, 1997. In it Circuit City seeks a declaratory judgment that its Associate Issue Resolution Program ("AIRP"), a mandatory program for arbitration of all employment disputes, does not violate the federal employment discrimination laws enforced by the EEOC. By Memorandum Opinion dated July 21, 1998 (the July 21 Opinion), the Court granted the EEOC's motion to dismiss this action on the ground that it was not ripe for review. By Memorandum Opinion dated October 1, 1998, the Court granted the motion of Circuit City to reconsider the July 21 Opinion, pursuant to Fed.R.Civ.P. 59(e), to account for new evidence and to prevent manifest injustice related to representations which had been made to the Court by the EEOC respecting matters relevant to its argument that this matter must be dismissed on ground of ripeness. In particular, the EEOC had made its decisional process the centerpiece of its ripeness argument, and it was made to appear at the hearing on the motion for reconsideration that previous representations made by counsel for the EEOC respecting the agency's decisional process were either not correct when made, or that circumstances had evolved while the matter was under submission which made the representations no longer true, or both.

As a consequence of the foregoing circumstances, the Court vacated the July 21 Opinion and required the EEOC to make certain reports and, as a result thereof, granted Circuit City's motion for limited discovery respecting the EEOC's decisional process which the EEOC had elected to make the focal point of the ripeness argument in its original motion to dismiss the action. That discovery has been concluded and the EEOC has renewed its motion to dismiss this declaratory judgment action on the ground that it is not ripe for decision. Additionally, and belatedly, the EEOC has asserted that the Court lacks subject matter jurisdiction because there has been no waiver of sovereign immunity as to any agency action here challenged.

## STATEMENT OF FACTS

The rather unique factual circumstances of this case have framed a somewhat unique jurisdictional issue. Consequently, it is necessary to recount in some detail

494

the actions of the EEOC which prompted the filing of this declaratory judgment action.[1]

In 1991, the Supreme Court of the United States held that predispute contractual agreements to submit to compulsory arbitration employment discrimination claims arising under federal statutes were permissible and enforceable under the Federal Arbitration Act ("FAA"), unless the text of the statute or its legislative history expressly precluded compulsory arbitration, or an inherent conflict existed between compulsory arbitration, or an remedial purposes of the particular statute. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. at 26–35, 111 S.Ct. 1647.[2] In the wake of the decision in *Gilmer* and several ensuing decisions of the courts of appeals, employers throughout the country began to adopt and implement mandatory arbitration programs both as a condition of considering an individual's application for employment as well as a condition of continued employment. These arbitration plans typically required that all disputes between the employer and employee, including those involving claims of employment discrimina-

tion under federal law,[3] be submitted to arbitration. The typical mandatory arbitration plan neither precludes an individual from seeking independent review of a discrimination claim by the EEOC nor prevents the EEOC from issuing a right to sue letter to the individual. However, because the arbitration agreements foreclose the employee's right to litigate in federal court based upon the individual. However, because the arbitration agreements foreclose the employee's right to litigate in federal court based upon the authority conferred by the right to sue letter, the EEOC determined that private party litigation would be of limited utility in achieving enforcement of the federal employment discrimination laws. Moreover, because these arbitration programs made the arbitral forum the *exclusive* place in which the employee could obtain relief, they were seen by the EEOC as an effort to preclude it from obtaining monetary or other relief on behalf of an individual or class of individuals.

Confronted with the trend toward mandatory arbitration of employment discrimination claims, the EEOC conclude that

1. The record here includes much more about the EEOC's decisional process than ordinarily would be available to be considered. However, in its original challenge to jurisdiction, the EEOC made much of the assertion that, because it did not have a quorum, it had not, and indeed could not, make a decision to institute suit on the Commissioner's Charge against Circuit City. It was not until September 1998 that the EEOC disclosed that, on January 2, 1998, the Commission had authorized litigation against Circuit City. *See e.g.* Memorandum Opinion of July 21, 1998, *vacated by Circuit City Stores v. EEOC*, 182 F.R.D. 496 (E.D.Va.1998). Thus, the assertions, on which the Court relied in issuing the July 21 Opinion, were not true. As a result, it became necessary to require the EEOC to disclose ordinarily protected communications so that the jurisdictional issue could be resolved on an accurate and truthful record. *See e.g.*, Memorandum Opinion of April 26, 1999.

2. Specifically, *Gilmer* held that compulsory arbitration of statutory claims under the Age Discrimination in Employment Act ("ADEA") was permissible and was not inconsistent with the statutory framework and remedial

purposes of the ADEA. *Gilmer* involved a agreement to submit to arbitration any controversy arising out of a registered securities representative's employment or termination of employment by his employer, a brokerage firm. Importantly, in *Gilmer* the agreement to arbitrate was imposed by way of the plaintiff's registration application with the New York Stock Exchange and was not created by way of an employment contract with the defendant. Because of that factual circumstances, *Gilmer* expressly reserved decision on the question of whether employment contracts are excluded from coverage under the FAA, and to date, that issue remains undecided by the Supreme Court. *Gilmer*, 500 U.S. at 25 n. 2, 111 S.Ct. 1647.

3. *See e.g.* Civil Rights Act of 1964, *as amended* 42 U.S.C. §§ 2000e et seq. ("Title VII"); Americans with Disabilities Act of 1990 as amended 42 U.S.C. §§ 12112 et seq. ("ADA"); Equal Pay Act of 1963, 29 U.S.C. §§ 206 et seq. ("EPA") and Age Discrimination in Employment Act of 1967, *as amended* 29 U.S.C. §§ 623 et seq. ("ADEA").

compulsory arbitration programs which require binding arbitration of employment discrimination claims as a condition of initial or continued employment were antithetical to the remedical purpose of the nation's employment discrimination laws and that such plans posed a substantial threat to the continued viability of those laws.[4] On February 6, 1996, the EEOC formally adopted a National Enforcement Plan ("NEP") which identified the agency's priorities for the enforcement of federal employment discrimination laws. The second of the three EEOC enforcement priorities identified in the NEP was "[c]ases having the potential of promoting the development of law supporting the antidiscrimination purposes of the statutes enforced" by the EEOC. That priority included "[c]laims presenting unresolved issues of statutory interpretation under one or more of the statutes enforced by the Commission," specifically, "[c]laims addressing the legality of agreements that mandate binding arbitration of employment disputes imposed as a condition of initial or continued employment." Doc. App. to Circuit City's Opposition to Renewed Motion to Dismiss at Exh. 1, § III.[5]

Shortly before the NEP was adopted, Philip Sklover became the Associate General Counsel of Systemic Litigation Services ("SLS"), a division of the Office of General Counsel which operates out of the EEOC's national headquarters in Washington D.C. Before adoption of the NEP, the SLS group handled a hodge-podge of cases that were investigated by regional field offices which then forwarded the matter to headquarters for possible litigation. Upon his arrival, Sklover "attempted to redefine the mission of [the SLS] unit to be more targeted and proactive and [to] get away from the large multi-issue, multi-bas[i]s cases that [SLS] used to bring and [instead] target more cutting edge issues for specifically [sic] enforc[ing][the] policies that the Commission had publicly announced with respect to legal issues." Katahira Depo. at 19:11–17. To that end, the EEOC's Office of General Counsel conducted a comprehensive review of arbitration programs adopted by companies throughout the country in an effort to identify appropriate litigation vehicles for the purpose of bringing lawsuits aimed at clarifying and reforming the state of the law subsequent to the *Gilmer* decision and its progeny in the courts of appeals and the district courts.[6] Circuit City was one of two companies selected as targets for the EEOC's efforts to further develop and reform the law and, therefore, the company's mandatory AIRP, adopted in 1995 as a condition of initial and continued employment, was identified as one of the programs to be judicially challenged by the EEOC. *See e.g.*, Doc.App. at Exh's 2–4.

During the summer of 1996, lawyers in the General Counsel's Office began to prepare for litigation by collecting information to use in a federal court action to challenge Circuit City's AIRP. First, the legal team selected a venue for bringing the action—

---

**4.** The EEOC previously had publicly expressed this view by way of amicus briefs submitted in several cases. *See* Sklover Depo. at 68:1–11.

Because these programs effectively eliminated the ability for individual employees to act upon a right to sue letter tendered by the EEOC, these programs were seen to represent a direct threat to the continued relevance of the EEOC itself.

**5.** Unless otherwise noted, all document references are to the Document Appendix provided in conjunction with Circuit City's opposition to the EEOC's renewed motion to dismiss and henceforth will be cited as "Doc.App. at Exh. ___."

**6.** In addition to reserving decision on the question of whether employment contracts were beyond the scope of the FAA, (see discussion note 1, *supra*), *Gilmer* also reserved decision on whether mandatory binding arbitration agreements constitute unenforceable contracts due to the unequal bargaining power between the employer and employee, concluding that "the claim of unequal bargaining power is best left for resolution in specific cases," *Gilmer*, 500 U.S. at 32–33, 111 S.Ct. 1647, and likewise left for case-by-case determination challenges to arbitration programs on the grounds of bias or procedural defects. *Id.* at 30–32, 111 S.Ct. 1647.

the Northern District of California in the Ninth Circuit—where the judges and the attitude toward arbitration were perceived by the EEOC's lawyers as most favorable to the Commission's objectives.[7] Thereafter, the lawyers endeavored to identify potential plaintiffs and witnesses whose presence in California would support venue for the forthcoming action in the North District of California.

By October 17, 1996, the General Counsel's team had prepared a Presentation Memorandum seeking approval to initiate a directed investigation into Circuit City's AIRP by filing a Commissioner's Charge against Circuit City.[8] The October 1996 Presentation Memorandum described the planned approach as follows:

> The General Counsel has identified mandatory arbitration as posing a substantial threat to the continued viability of the anti-discrimination laws. This is the first of two expected requests for Commissioner's charges targeting this issue. Because Circuit City adopted its program in response to the Supreme Court's ruling in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), we believe there is little chance this charge will be resolved through conciliation. Should conciliation fail, SLS as the headquarters' litigation unit, *is prepared to move the charge expeditiously into litigation.*

Doc.App. at Exh. 4, § I (second emphasis added). The substantive allegations set forth in the October 1996 Presentation Memorandum against Circuit City's AIRP are numerous and need not be discussed at this stage of the proceedings. However, the rationale for selecting Circuit City as a defendant is relevant to the jurisdictional inquiry and that rationale is explained in that Presentation Memorandum as follows:

> We have chosen Circuit City as a target for a number of reasons. First, Circuit City is a large and growing employer. As of mid–1996, Circuit City employed over 36,000 employees and operated 429 retail locations in 37 states and the District of Columbia. It recently announced plans to open over 400 new retail stores during the next eight years, nearly doubling its size. Additionally, Circuit City has eight (8) wholly owned subsidiaries, including a fast growing business trading under the name CarMax .... Because of its geographical spread, Circuit City offers SLS the opportunity under the broad venue provisions of the civil rights laws to strategically select the location of any future lawsuit. Ultimately this issue will have to be decided by the Supreme Court. By strategically locating our lawsuit, we hope to increase the likelihood of a split in the circuits and expedite the Court's consideration of this issue.

*Id.*[9] Thus, it is clear that, at least by October 17, 1996, the General Counsel's

---

7. The General Counsel's office especially disfavored venue in the Fourth Circuit, particularly in the Eastern District of Virginia and especially in the Richmond Division which is where Circuit City's corporate headquarters are located.

8. In addition to reviewing charges filed by individual employees, "[a]ny member of the Commission may [also] file a charge with the Commission." 29 C.F.R. § 1601.11. The form and content of a charge filed by a member of the Commission is the same as that of a charge filed by, or on behalf of, an individual. *See id.* at §§ 1601.9, 1601.12. Unlike individual charges, "Commissioner charges may not be withdrawn .... after a determination as to reasonable cause has been made." *Id.* at § 1601.11.

9. Because of the EEOC's claim of privilege, the complete text of the quoted passage was not disclosed in its entirety to Circuit City. *See* Doc.App. at Exh. 4. Select portions of the document were redacted because, at the time, the Court accepted the EEOC's asserted claim of privilege. However, because the Court now concludes that the complete passage quoted herein is probative of the state of the EEOC's decisional process and because that issue is directly implicated in the renewed motion to dismiss, the Court concludes that complete redaction of this passage was in error. *See,* Memorandum Opinion of April 26, 1999 for fuller explication of the rationale for this finding.

litigation group fully expected that the requested Commissioner's Charge would not be resolved by conciliation [10] and would be resolved only in litigation against Circuit City. The October 1996 Presentation Memorandum was approved by the General Counsel without revision. Stewart Depo. at 17–18. On October 30, 1996, the proposed charge, which was based on that Presentation Memorandum, was approved by Commissioner Paul Miller, again, without revision. Id. at 22–24.

On November 18, 1996, the EEOC sent to Circuit City a copy of the Commissioner's Charge, a directed investigation letter [11] and a first request for information. On February 5, 1997, Circuit City's counsel met with Philip Sklover, Wesley Katahira and Gerald Letwin, lawyers on the EEOC's General Counsel's team directing the impending litigation to invalidate Circuit City's AIRP and thereby to reform the law respecting such programs. The purpose was to deliver Circuit City's response to the Commissioner's Charge. Circuit City submitted a copy of the AIRP packet as it was distributed to employees when the program was instituted, a copy of the AIRP packet as it was given to would-be applicants, and an affidavit from Circuit City's Arbitration Coordinator confirming that the company had indeed adopted, implemented and continued to maintain a compulsory arbitration program as alleged in the charge. Having thus admitted all that the EEOC sought to investigate and prove, Circuit City asserted that only a

legal issue, appropriate for summary judgement, remained to be resolved.

The EEOC's lawyers appear to have concurred with Circuit City's assessment. For example, Katahira's notes from that date recount Circuit City's position and then state: "Strategy meeting with SLS team. Me—draft decision in Circuit City. Search district court dockets for live … cases in L.A. and S.F." See Doc.App. at Exh. 14, p3. Also, on February 5, 1997, Sklover sent a memo to the Deputy General Counsel stating: "Here is the current status of the above cases [12] pursuant to your request. As SLS has explained previously, both cases are on a fast track for litigation should conciliation fail." Doc. App. at Exh. 17. After describing the position taken by Circuit City at the February 5, 1997 meeting, Sklover concluded: "Under these circumstances, we will proceed to the next step and draft a proposed Commission decision. We expect to complete our draft Commission decisions in both cases within a month…" Id.

Consistent with those expectations, the budget for the group assigned by the General Counsel to prosecute the case against Circuit City reveals that funds had been allocated in the second quarter [13] of fiscal year 1997 (January through March 1997) to litigate the pending Commissioner's Charge against Circuit City. Doc.App. at Exh. 6. Additionally, the SLS activity report for the second quarter of fiscal year 1997 recounts the status of the Circuit City Commissioner Charge as follows:

10. There are four steps prefatory to the institution of litigation by the EEOC: "serve the charge on the employer…, investigate the charge, determine that reasonable cause exists to believe the charge is true, and endeavor to eliminate the alleged unlawful employment practices 'by informal methods of conference, conciliation and persuasion.'" Patterson v. American Tobacco Co., 535 F.2d 257, 271–72 (4th Cir.1976).

11. In furtherance of its enforcement powers, the Commission has the power to investigate a particular charge including, by way of example, the rights to gather data, inspect records, and interview employees. See e.g., 29

C.F.R. §§ 1601.15, 1601.16, 1626.15 and 1640.7.

12. The reference to "cases" reflects that the memorandum included a discussion about another Commissioner charge against another company, which is wholly irrelevant to the charge against Circuit City.

13. For any fiscal year, the federal government operates under the following timetable: The first quarter is from October 1 through December 31; the second quarter is from January 1 through March 31; the third quarter is from April 1 through June 30; and the final quarter is from July 1 though September 30.

Met with Circuit City regarding the above Commissioner's Charge, and associated Directed Investigation, seeking to eliminate compulsory arbitration policies as violating the anti-discrimination statutes. *Investigation is completed.* The Commission decision is being drafted. *Litigation will follow, if no conciliation agreement is reached following issuance of Commission Decision.*

Doc.App. at Exh. 21 (emphasis added).

On March 4, 1997, the General Counsel's legal team tasked with the Circuit City litigation requested authorization for three attorneys to travel to San Francisco in support of the pending Circuit City charge. The request for funds stated that:

The basis for the proposed trip is to confer with the preeminent of private plaintiff firm[s] Saperstein, Goldstein, Ballar and Dumchek [sic] for the purposes of: (1) devising an effective litigation management structure...; (2) to evaluate litigation tracking and document management systems with the view of adapting such processes to our use; and (3) *to discuss and possibly firm up the details of a joint prosecution of a nation-wide, high profile class case.*

\* \* \* \* \* \*

B. *Joint Litigation of Possible Class Case*

We have been discussing with Barry Goldstein [a private lawyer] the possibility of a joint case against *Circuit City.* Several clients of the firm have filed charges of race discrimination with the Commission. The "clock is ticking" on the six month statute of limitations before suit can be filed.

\* \* \* \* \* \*

C. *Interview of Witnesses in Circuit City Commissioner's Charge Investigation:*

An additional benefit of the proposed trip will be the opportunity to interview and obtain statements from several witnesses in our Commissioner's Charge investigation against *Circuit City.* That investigation is restricted to the *Gilmer*

issue of mandatory arbitration as a condition of future employment. Because of the divergence in decision law in various circuits, filing suit in the Ninth Circuit is our current preference. To do so, and to limit the risk of a transfer to the relatively unfavorable, we need more than the existence of facilities in the Ninth Circuit [sic]. We require persons who have been specifically aggrieved by the waiver policy.

Doc.App. at Exh. 19 (emphasis in first paragraph added).

The travel request was approved and, from April 9 through April 11, 1997, the General Counsel's Circuit City team traveled to San Francisco where they met with representatives of the Saperstein firm and "agree[d] on an overall strategy relative to prospective litigation against Circuit City." Doc.App. at Exh. 30. In a subsequent report, the accomplishments of the California trip were recounted as follows:

The *agreed upon approach is for the Commission to file a separate action* restricted to a challenge of the legality of the arbitration procedure as applied to both applicants and employees. Our suit will allege statutory violations of all the statutes the Commission enforces. At the same time, the private action [to be brought by the Saperstein firm] will be commenced on the promotion issue, confined to the single statutory basis of Title VII and will allege only race discrimination. *As soon as the affirmative defense of the arbitration issue is raised as a bar to the private action, we will move to intervene and consolidate the actions.*

The Commission's approach of bringing a separate action will allow the Agency or the defendant to appeal a decision on the arbitration issue. Otherwise the same decision on the arbitration issue in the private action may be isolated from an immediate appeal as it may not be a final order....

As expressed at the meeting, our goal was to complete the administrative pro-

cess to *enable the Commission to file its action in early July.* However, there will be a *slippage of several weeks* in this timetable.

*Id.* (emphasis added).

Consistent with the agreed upon approach and the foregoing time line, on June 23, 1997, a proposed Commission Decision, finding reasonable cause to believe that Circuit City's AIRP was unlawful, was forwarded to the General Counsel for approval. Doc.App. at Exh. 32. The General Counsel approved the decision, without revision, the next day. *Id.* On July 3, 1997, the Commission Decision (sometimes referred to herein as the "reasonable cause determination") was signed by the Director of Field Programs,[14] and was forwarded to Circuit City. The Commission Decision was accompanied by a letter which notified Circuit City, in no uncertain terms, that, the *only* way in which Circuit City could comply with the statutes which the EEOC is charged with enforcing, was for the company to "completely disestablish the AIRP as it relates to the statutes the Commission enforces" within fourteen days. Doc.App. at Exh. 37. If Circuit City failed to so act within that time, the letter advised that the EEOC "will deem conciliation to have failed" and concluded with the statement that, if Circuit City did not thusly disestablish its AIRP, the "Commission may commence litigation of this matter in the United States District Court." *Id.*

In fact, the EEOC considered that conciliation had failed before it sent the Commission Decision to Circuit City. This is made clear by the activity report for the third quarter of fiscal year 1997 (which ended on June 30, 1997) which reported the status of the Circuit City investigation as of that date as follows:

> The Charge alleges that Circuit City's mandatory arbitration policy violates the anti-discrimination statutes the Commission enforces. The investigation is completed and the proposed Decision has been issued. *Conciliation efforts have failed.* A Presentation Memorandum has been drafted and submitted to the General Counsel for approval, prior to transmission for litigation approval.

Doc.App. at Exh. 34. (emphasis added). In fact, the record shows that, from the outset, the EEOC never expected this matter to be resolved through conciliation. Thus, the Court concludes that, on the facts of this case, the otherwise normal "conciliation phase" was simply an illusion; save for the perfunctory passage of time, it was clear that no conciliation of the dispute would ever take place. Indeed, the EEOC had initiated and conducted the investigation of Circuit City for the express purpose of bringing a lawsuit (a purpose which is directly antithetical to the process of conciliation), and, in furtherance of that goal, the EEOC had taken the position that the only way Circuit City could comply with the nation's employment discrimination laws was to completely abandon its AIRP, a stance guaranteed to land both parties in federal court. Thus, the record shows clearly that conciliation had failed by June 30, 1997 which is before the date the Commission Decision was issued.[15]

On July 10, 1997, one week after the Commission Decision was delivered to Circuit City, the EEOC released its Policy Statement on Mandatory Binding Arbitration of Employment Discrimination Disputes as a Condition of Employment (the

---

14. The EEOC's Office of Field Programs is the group which, in the usual course, would have conducted the Circuit City investigation had the matter not been in the hands of the General Counsel to be readied for litigation. This Commission Decision is also known as a "Letter of Determination." It is not, as the name suggests, a decision made by the EEOC Commissioners. It was not until July 9, 1997, some six days after the Commissioner Decision had been issued, that a copy of it was forwarded to Commissioner Miller, the Commissioner who had signed the original charge that began the investigation into Circuit City's AIRP. Doc.App. at Exh. 38.

15. It appears that the EEOC and Circuit City considered that, after the meeting on February 5, 1997, conciliation was had and concluded, unsuccessfully.

**500**

"Policy"). In the Policy, EEOC declared "that agreements that mandate binding arbitration of discrimination claims as a condition of employment are contrary to the fundamental principles evinced" in the nation's employment discrimination statutes. Doc.App. at Exh. 39, at p2, ¶ 7. The Policy also highlighted what the EEOC thought to be the importance of continued judicial enforcement of the employment discrimination laws in the federal courts, including: (1) further development and interpretation of the law; (2) vindication of the public interest in eradicating invidious discrimination; (3) deterring future acts of discrimination; (4) ensuring that the victims of discrimination are made whole to the full extent permitted under law; and (5) providing a public forum to ensure that the employment discrimination laws are correctly interpreted and applied. *See id.* at § IV. The Policy articulated that mandatory arbitration programs stood as impediments to these goals and concluded with the statement that:

> The use of unilaterally imposed agreements mandating binding arbitration of employment discrimination disputes as a condition of employment harms both the individual civil rights claimant and the public interest in eradicating discrimination. Those whom the law seeks to regulate should not be permitted to exempt themselves from federal enforcement of

civil rights laws. Nor should they be permitted to deprive civil rights claimants of the choice to vindicate their statutory rights in the courts—an avenue of redress determined by Congress to be essential to enforcement.

\* \* \* \* \* \*

> The Commission will process a charge and bring suit, in appropriate cases, notwithstanding the charging party's agreement to arbitrate.

*Id.* at § VII. Finally, the Policy unequivocally stated that "[p]ursuant to ... the National Enforcement Plan, ...the Commission will continue to challenge the legality of specific agreements that mandate binding arbitration of employment discrimination disputes as a condition of employment." *Id.*

By letter dated July 18, 1997, counsel for Circuit City informed the EEOC that it had rejected the pro forma "conciliation" proposal and instead had filed this declaratory judgment action to ascertain whether, as the EEOC had concluded, the AIRP was unlawful. Two business days after the Complaint was served, the EEOC's lawyers sent the complaint (which publicly disclosed the normally confidential Commission Decision by including it as an unsealed attachment to the complaint) to private attorneys representing plaintiffs in numerous actions against Circuit City.[16]

16. In fact, throughout the entire investigative process and the pendency of this action, the General Counsel's Circuit City team has had regular and extensive contacts with private litigants and/or their counsel for the express purpose of determining whether the AIRP was implicated in the private actions and if it was not, to encourage the private litigant to challenge the program. In addition, attorneys from the General Counsel's Circuit City team regularly provided assistance to private counsel for the purpose of bolstering private actions by forwarding copies of recent court decisions, many unpublished, and/or offering proposed discovery questions aimed at fleshing out the legal issues respecting Circuit City's AIRP. Outside contacts regularly included attorneys at the Washington Lawyers Committee, at the firm of Howery & Simon, and at the Saperstein law firm.

The record discloses that the first communication with outside counsel occurred as early

as July 15, 1996, when Dann Determan, an attorney at the Washington Lawyers' Committee, sent Sklover a facsimile copy of Circuit City's arbitration program rules. Doc.App. at Exh. 3. Because the date of that communication precedes even the Presentation Memorandum requesting approval of a Commissioner's Charge, it strongly suggests that the EEOC had disclosed the anticipated investigation of Circuit City to private counsel before receiving the appropriate approval and before initiating any communication with the company. The last communication with outside counsel reflected in the record occurred as recently as May 3, 1999, when a member of the SLS team sent an unpublished decision in a case involving Circuit City to a private attorney in California. Doc.App. at Exh. 83.

For a history of communications with private attorneys see generally Doc.App. at Exh. 3; Exh. 8; Exh. 12; Exh. 14; Exh. 15; Exh.

On August 19, 1997, lawyers from the EEOC's General Counsel's Circuit City team met with lawyers from the EEOC's Office of Legal Counsel[17] to assess the impact of Circuit City's declaratory judgment action on the Commission Decision finding Circuit City's AIRP unlawful. One lawyer from the General Counsel's office who was present at the meeting testified that ".. the impact was that it complicated it quite a bit. And we were concerned about filing suit in California while this case was still pending and then being involved in a protracted fight over transfer and [forum non conveniens.] I mean we did consider that." Katahira Depo. at 96: 6–11.

Notwithstanding that the EEOC had concluded that conciliation had failed by June 30, 1997, the EEOC, on September 8, inexplicably sent a letter to Circuit City stating that "[n]o further efforts to conciliate this case w[ould] be made." Doc.App. at Exh. 48. The letter also stated that "the Commission is considering whether to commence litigation of this matter." *Id.* Sometime in August, 1997, the General Counsel's Circuit City team drafted a Presentation Memorandum recommending litigation which was forwarded to the General Counsel for approval on September 12, 1997. According to the Presentation Memorandum, the litigation was necessary "to enforce the Commission policy on mandatory arbitration [which was issued on July 10, 1999], consistent with the Commission's National Enforcement Plan ("NEP"), which identified mandatory arbitration as an enforcement priority." Doc. App. at Exh. 55, § I. And, to that end, that Presentation Memorandum, like its October 1996 predecessor, recommended that

the litigation "not seek to reform [Circuit City's] mandatory arbitration program . . . but .. [rather] seek to invalidate the program in its entirety." *Id.* On November 12, 1997, the General Counsel transmitted that Presentation Memorandum, without revision and with his endorsement, to the Commissioners for their approval.

Although the form and length of the November Presentation Memorandum were slightly different than the October 1996 Presentation Memorandum approved by the General Counsel to start the investigation against Circuit City, the substance of the November Presentation Memorandum was the same as the earlier document. For reasons not entirely clear, the November Presentation Memorandum was withdrawn shortly after it was submitted, *see* Doc.App. at Exh. 58, and was resubmitted without change on December 18, 1997 with a memorandum declaring that urgent action was required. *See* Doc.App. at Exh. 56.

The record is unclear why, considering that litigation with Circuit City had been the EEOC's goal for over a year, the EEOC's lawyers sent the letter of September 8, 1997, stating that "the Commission was considering whether to commence litigation of this matter." Nor is it clear why the General Counsel, who has delegated authority in the NEP to institute litigation without Commission approval and who had devised the plan to litigate Circuit City's AIRP to reform the law, prepared (beginning in late August 1997) the Presentation Memorandum that was sent to the Commission in November for approval to institute litigation. The General Counsel testified that he sought Commission approval

---

18; Exh's 22–25; Exh's 27–29; Exh. 35; Exh. 36; Exh's 40–46; Exh. 50; and Exh. 83.

Whether these several communications are an aspect of the EEOC's proper role in helping private litigants within the confines of the EEOC's controlling rules is not before this Court. However, the communications are probative evidence of the extent of the EEOC's commitment to foster litigation respecting the legitimacy of Circuit City's AIRP and the ensuing hardship to Circuit City.

17. As previously explained, SLS is a division within the Office of General Counsel, the legal arm of the EEOC charged with enforcing the statutes under the EEOC's cognizance. The Office of Legal Counsel is responsible for assisting the EEOC in drafting policy statements and for defending the EEOC in actions such as this action.

because this was a unique case. That explanation rings hollow because the case was no more unique in November than it was when the investigation started in 1996 or when the reasonable cause determination was issued on July 3, 1997 except that this action had been filed and the EEOC was trying to have it dismissed on the ground that it was not ripe. And, the EEOC's position on the ripeness was built on the argument that the EEOC did not have a quorum and that the agency's decisional process was not complete until the Commission had acted. Considering the record and the implausible explanation given by the General Counsel, the Court regrettably concludes that the forwarding of the November Presentation Memorandum to the Commission was part of the EEOC's orchestrated effort to demonstrate the absence of ripeness for judicial review of this action and that the decision to litigate against Circuit City over its AIRP had been made long before the issuance of the Commission Decision on July 3.

In any event, on January 2, 1998, the EEOC unanimously voted to authorize litigation against Circuit City. Doc.App. at Exh. 61. That decision was not disclosed to Circuit City or the Court until September 23, 1998 during argument on Circuit City's motion to reconsider the July 21 Opinion in which the EEOC's original motion to dismiss for lack of subject matter jurisdiction on ground of ripeness was granted.[18]

Also, on October 1, 1998, the Court issued an order requiring resubmission of the jurisdiction issue. Then, on October 21, 1998, the General Counsel sent Circuit City a letter advising that "the EEOC will not file suit on the [pending] Commissioner's charge, shall not take further actions with respect to the Charge, and has permanently closed the case file." Doc.App. at Exh. 72. The purpose of that letter was to allow the EEOC to seek dismissal of

Circuit City's declaratory judgment action on the grounds that it was moot. *Id.*

It is against this factual background that the EEOC's renewed motion to dismiss this action for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) must be assessed. The EEOC raises the following arguments in support of its motion: (1) the action is barred by the doctrine of sovereign immunity; (2) if not so barred, the Complaint fails to raise a federal question; (3) assuming the existence of a federal question, this matter was not ripe for judicial review when it was filed because (a) the EEOC had not made a final decision respecting whether it would file suit against Circuit City; and (b) Circuit City will suffer no hardship by having this action dismissed; and (4) even if this matter was ripe, it is now moot.

## DISCUSSION

### A. STANDARD FOR DISMISSAL UNDER RULE 12(B)(1)

Jurisdiction in this action is predicated upon the presence of a federal question within the meaning of 28 U.S.C. § 1331. Jurisdiction is also assertedly found under 28 U.S.C. § 1337 which confers jurisdiction over actions "arising under any Act of Congress regulating commerce or protecting trade ..." and under specific sections of several employment discrimination laws.[19]

■ Fed.R.Civ.P. 12(b)(1) permits a defendant to move for dismissal when it is alleged that the court lacks jurisdiction over the subject matter of an action. A motion under Rule 12(b)(1) involves an evidentiary attack to the jurisdictional allegations in the complaint. "Unlike the procedure in a Rule 12(b)(6) motion where there is a presumption reserving the truth finding role to the ultimate factfinder, the court in a 12(b)(1) hearing weighs the evi-

---

**18.** As explained above, the July 21 Opinion was subsequently vacated on October 1, 1998 when Circuit City's motion to reconsider the July 21 opinion was granted.

**19.** Complaint at ¶ 4.

dence to determine its jurisdiction." *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982). Thus, allegations of jurisdiction are not accorded the presumption of correctness which they would otherwise receive, for example, when dismissal is sought under Fed.R.Civ.P. 12(b)(6). *See Virginia v. United States,* 926 F.Supp. 537, 540 (E.D.Va.1995).

■■■■ The party asserting jurisdiction, here Circuit City, has the burden to prove the existence of subject matter jurisdiction. *Williams v. United States,* 50 F.3d 299, 304 (4th Cir.1995). Because a Rule 12(b)(1) motion challenges the actual existence of the Court's subject matter jurisdiction, the Court may "look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Virginia,* 926 F.Supp. at 540–41 (citing *Capitol Leasing Co. v. F.D.I.C.,* 999 F.2d 188, 191 (7th Cir.1993)); *see also, Adams,* 697 F.2d at 1219; *Ocean Breeze Festival Park, Inc. v. Reich,* 853 F.Supp. 906, 911 (E.D.Va.1994) *affirmed by Virginia Beach Policemen's Benev. Ass'n v. Reich,* 96 F.3d 1440, 1996 WL 511426 (4th Cir.1996). That evidence is set forth in the Statement of Facts.

## B. SOVEREIGN IMMUNITY

■■■■ The EEOC now contends that, as to the agency actions being challenged here, the United States has not waived its sovereign immunity against suit and that, therefore, there is no subject matter jurisdiction over this action. It is axiomatic that the doctrine of sovereign immunity operates to shield the United States from suit unless it consents to be sued. *F.D.I.C. v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Research Triangle Inst. v. Board of Gov. of the Fed. Res. Sys.,* 132 F.3d 985, 987 (4th Cir.1997).

And, any waivers of sovereign immunity must be "construed strictly in favor of the sovereign." *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 685, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983); *see also Department of Army v. Blue Fox, Inc.,* 525 U.S. 255, 119 S.Ct. 687, 691, 142 L.Ed.2d 718 (1999) (waiver of sovereign immunity must be unequivocally expressed in the statutory text); *Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (same); *Research Triangle Inst.,* 132 F.3d at 988 ("A waiver of federal sovereign immunity can be found in one of two places: in specific statute governing governmental entity, or in one of broad waivers of immunity made by Congress for certain classes of federal agencies.") [20]

Because the defendant here, the EEOC, is an agency of the federal government, this action, although nominally against a federal agency, is, in reality, one against the United States. *Hawaii v. Gordon,* 373 U.S. 57, 58, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963). Thus, in order for Circuit City's suit for declaratory judgement to proceed, it must be shown that the United States has clearly and unequivocally waived sovereign immunity with respect to the action here presented.

### 1. Jurisdiction Under Circuit City's Complaint

Circuit City's complaint is the logical place to begin the inquiry. The complaint invokes the Court's jurisdiction pursuant to the following: (1) general federal-question jurisdiction under 28 U.S.C. § 1331; (2) federal jurisdiction over commerce and antitrust regulations under 28 U.S.C. § 1337; (3) the Declaratory Judgement Act, 28 U.S.C. § 2201; (4) Title VII, 42 U.S.C. §§ 2000e–5 and 2000e–6; (5) the American with Disabilities Act, 42 U.S.C. § 12117; (6) the Age Discrimination in

**20.** Indeed, absent an "unequivocal expression" of a waiver of sovereign immunity in the text of a statute, no waiver can be found even if the statute's legislative history supports the inference that sovereign immunity has been waived. *Lane,* 518 U.S. at 192, 116 S.Ct. 2092; *see also Mann v. Haigh,* 120 F.3d 34, 37 (4th Cir.1997).

Employment Act, 29 U.S.C. § 626; and (7) the Equal Pay Act, 29 U.S.C. § 206(e).

 It is well settled that 28 U.S.C. §§ 1331 and 1337[21] do not, in and of themselves, operate as a general waiver by the United States of its sovereign immunity. *Randall v. United States,* 95 F.3d 339, 345 (4th Cir.1996) (§ 1331); *Food Town Stores, Inc. v. E.E.O.C.,* 708 F.2d 920, 922 (4th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984) (§ 1331); *Hunter v. United Van Lines,* 746 F.2d 635, 639 (9th Cir.1984) *cert. denied,* 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 150 (1985); *rehearing denied,* 474 U.S. 1014, 106 S.Ct. 547, 88 L.Ed.2d 476 (1985) ("arising under" language in § 1337 interpreted in same way as under § 1331); *B.F. Goodrich Co. v. Northwest Indust.,* 424 F.2d 1349, 1354 (3rd Cir.1970) (§ 1337). Nor does the Declaratory Judgement Act constitute a waiver of sovereign immunity or create a jurisdiction. *Robishaw Engineering Inc. v. United States,* 891 F.Supp. 1134, 1142 (E.D.Va. 1995); *Ocean Breeze Festival Park,* 853 F.Supp. at 917. Thus, 28 U.S.C. § 1331, § 1337 and § 2001 cannot provide a jurisdictional base upon which a court may entertain Circuit City's declaratory action against the United States.

 The inquiry then turns to the employment discrimination statutes invoked in Circuit City's complaint. And, as with the statutes already discussed, none of the employment discrimination statutes unequivocally and clearly provide for an action such as this one against the United States. Thus, none of the employment discrimination statutes on which Circuit City relies in paragraph (4) of its complaint provides a waiver of sovereign immunity for the type of action here presented. Circuit City does not contend otherwise.

### 2. Jurisdiction Under the Administrative Procedure Act

Confronted with the EEOC's belated assertion of sovereign immunity, Circuit City now relies on the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 to defeat the claim of sovereign immunity and to serve as the jurisdictional predicate for review of the EEOC's action by way of a plea for declaratory judgment as to the correctness of the agency's action.[22]

 In 5 U.S.C. § 702 of the APA, Congress has waived sovereign immunity in "nonstatutory review" cases wherein nonmonetary relief is sought. *Food Town,* 708 F.2d at 922. That section provides as follows:

A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof. An action in a court of the United States seeking relief other than monetary damages and stating a claim that an agency or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States.

5 U.S.C. § 702. Thus, § 702 of the APA, together with 28 U.S.C. § 1331, vests in district courts jurisdiction over reviewable

**21.** Circuit City appears to have abandoned the position that there is federal question jurisdiction by virtue of 28 U.S.C. § 1337 because that ground of jurisdiction has not been asserted in the briefs on the jurisdictional issue. Hence, the existence of jurisdiction on that ground will not be considered further.

· **22.** Circuit City did not assert the APA as a jurisdictional predicate in its complaint. However, that omission will not defeat assessment of the complaint pursuant to the APA, provided, of course, that a cognizable claim is made out under the APA. *Randall v. United States,* 95 F.3d 339, 346 (4th Cir.1996) *cert. denied,* 519 U.S. 1150, 117 S.Ct. 1085, 137 L.Ed.2d 219 (1997) ("[f]ederal jurisdiction may be sustained on the basis of a statute not relied upon or alleged in the pleadings. Thus, if the allegations in Plaintiff's complaint are sufficient to support jurisdiction under a provision ... such as the APA, this court is authorized to examine the case under that provision.")

federal actions taken under federal law or regulation. *Hostetter,* 739 F.2d at 985; *see also* 4 K. Davis, Administrative Law Treatise § 23:3, p.129 (2d ed.1983) ("[a] case brought by a plaintiff who seeks review of a reviewable action of a federal agency is a civil action arising under the Constitution, law or treaties of the United States, and such a case may be brought under § 1331 unless some other statute is interpreted to withdraw the jurisdiction that § 1331 confers.")

The jurisdiction created by the APA is not however, a generalized right of review. Rather, the APA confines judicial review to "agency actions" which are defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent denial thereof, or failure to act." 5 U.S.C. § 551(13). In addition, courts may review only those agency actions which are made reviewable by statute[23] or which are final. *Id.* at § 704. Finally, there can be no review under the APA if a statute precludes judicial review or when the particular agency action being challenged is an action committed to agency discretion by statute. *Id.* at § 701(a).

By virtue of the foregoing principles, Circuit City may rely on the waiver of sovereign immunity afforded by Section 702 of the APA only if the APA is implicated in the first instance: that is, only if there has been an agency action which is subject to review. That, in turn, raises the question: What conduct by the EEOC is it that Circuit City is seeking to have reviewed and is that conduct an "agency action" under the APA?

#### a. The Putative Agency Action

Circuit City has identified the reviewable agency action to be the application of the EEOC's NEP to the company's AIRP under the circumstances, and in perspective of, the agency conduct which followed the adoption of the NEP and which is outlined in detail in the STATEMENT OF FACTS.[24] In Circuit City's view, the agency action of which it complains began with the EEOC's adoption of the NEP for the purpose of reforming an extant body of law manifested (i) by *Gilmer* and its lower federal court progeny; and (ii) by the FAA which permits enforcement of employment agreements that contain provisions requiring mandatory arbitration of employment discrimination claims based on federal statutes.

To implement that objective, the EEOC's General Counsel (pursuant to a delegation of authority in the NEP) further acted on behalf of the agency to select Circuit City as a vehicle to effectuate reform of the law through litigation, the purpose of which was to secure a decision that the AIRP, like all mandatory arbitration plans, was an unlawful employment practice. The General Counsel's lawyers, having selected a forum which was thought to favor the EEOC's views, continued to act to apply the NEP to Circuit City by conducting an investigation to secure evidence to support bringing litigation in the chosen forum. And, to strengthen the basis for litigation in that preferred venue, the General Counsel's team devised a strategy to prosecute the EEOC's litigation against Circuit City in consolidation with forthcoming private litigation in the same forum.

The next act comprising the continuum of agency action was the failure of conciliation over the charge in the Commission Decision which occurred by June 30, 1997. Then, on July 3, 1997, the EEOC acted by issuing a Commission Decision determining that there was reasonable cause to believe that the AIRP was an unlawful employment practice. The last step occurred a few days later, on July 10, 1999, when the EEOC acted by issuing its official Policy Statement on Mandatory Binding Arbitration of Employment Disputes as a Condition of Employment. In sum, it is Circuit City's position that these several acts taken by the EEOC and its General Counsel, pursuant to the delegation given

---

**23.** The parties agree that no such statutory review provision is implicated here.

**24.** Trans. of Hearing, July 23, 1999 at 7–10; 15–22 (hereinafter " Trans. July 23 at ___").

him in the NEP, and their cumulative effect, constitute an agency action which is reviewable under the APA.

### b. Are These Acts, Individually or Collectively, an Agency Action?

In a literal sense, everything that an agency does (or fails to do) constitutes an agency "action." However, that term is not so broadly defined in the APA. Rather, the APA limits the term "agency action" to a discrete set of conduct, including agency rules, orders, sanctions, licenses, relief, the equivalent denial thereof, or the failure to act. 5 U.S.C. § 551(13). Hence, it is appropriate to look at the acts in the continuum of conduct allegedly comprising the agency action to see if, individually or collectively, they qualify for that treatment under the APA.

### (1) The NEP

■ Circuit City contends that the NEP and its application to the AIRP, is reviewable as a "rule" which is defined as "the whole or part of an agency statement of general or particular applicability and future effects designed to implement, interpret, or prescribe law or policy ..." *Id.* at § 551(4). That argument presents the initial question whether the NEP is a "rule" within the meaning of the APA. According to Circuit City, the NEP qualifies as a rule because in that document, the EEOC "made ... essentially a dispositive finding that a mandatory pre-dispute agreement for binding arbitration of employment claims is unlawful." [25] That is an erroneous description of the NEP and what it provides with respect to mandato-

ry arbitration plans. The NEP simply announces the EEOC's priorities for allocating its resources to its many and varied enforcement activities. It identifies three major categories of priorities each of which includes a series of subcategories. The second of those priorities are "claims presenting *unresolved issues of statutory interpretation,*" which include, among ten other matters, "claims addressing the legality of agreements that mandate binding arbitration of employment discrimination disputes imposed as a condition of initial or continued employment." Doc.App. at Exh. 1, § III (emphasis added).[26] The NEP does not articulate that a mandatory arbitration program constitutes a violation of the federal employment laws.

Moreover, as a general announcement respecting how the EEOC would use its limited resources, the NEP cannot be categorized as a rule of any sort, much less one which sounded the death knell of mandatory arbitration programs, because it does not impose any obligations or duties upon employers, nor is the NEP "the whole or part of an agency statement of general or particular applicability and future effect *designed to implement, interpret or prescribe law or policy*" 5 U.S.C. § 551(4) (emphasis added) (defining a "rule" under the APA). Of course, in several amicus curiae briefs, which preceded the issuance of the NEP, the EEOC had argued that programs like the AIRP were unlawful and the agency's General Counsel had reached that conclusion before the NEP was issued. That, however, does not make the NEP a rule, or any other form of "agency action" for that matter.

---

**25.** Trans. July 23 at 8:21–25; 9:1–7 (referring to Doc.App. at Exh. 1, § III(h)). Although Circuit City holds the view that NEP should have been adopted pursuant to formal rule making procedures, Circuit City is not challenging the NEP itself or the manner in which it was adopted. It is doubtful whether Circuit City is correct. Pursuant to 5 U.S.C. § 553(3)(A) "interpretative rules, *general statements of policy,* or rules of agency organization, procedure or practice" are exempt from the general publication, notice and comment requirements of the APA unless otherwise required by statute.

**26.** Because in *Gilmer,* the Supreme Court expressly reserved decision on whether employment contracts are excluded from coverage under the FAA and left for case-by-case determination the questions of whether unequal bargaining power or procedural defects would render a particular arbitration program invalid, there surely existed unsettled questions of law respecting the proper scope of arbitration agreements and there is nothing inappropriate about the EEOC wishing to flesh out the contours of these unresolved areas.

Circuit City argues that the EEOC's adoption and application of its NEP is analogous to the EEOC's implementation and enforcement of "Final Interpretative Guidelines" in *Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*, 510 F.Supp. 66 (E.D.Va.1981) *reversed on other grds.*, 667 F.2d 448 (4th Cir.1982) (the Fourth Circuit reversed the District Court's conclusion that the employer's disability plan was not in violation of the Pregnancy Discrimination Act; neither opinion addressed whether, in the first instance, there was a reviewable agency action under the APA). In *Newport News,* the EEOC published for public comment, and eventually adopted, guidelines which interpreted the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) and Title VII, 42 U.S.C. § 2000e et seq., as precluding an employer from providing disability coverage for dependents of employees while excluding from such coverage the pregnancy-related expenses of spouses of male employees. *Newport News,* 510 F.Supp. at 69. The employer brought suit to enjoin enforcement of the guidelines on the grounds that they were beyond the statutory powers of the EEOC, contrary to the intent of Congress, contrary to controlling Supreme Court precedent and were, therefore arbitrary, capricious and not in accordance with law. *Id.* at 67.

*Newport News* is not controlling here for several reasons. First, *Newport News* did not decide whether the Final Interpretative Guidelines there at issue were properly subject to review under the APA. Instead, the decisions of the District Court and the Court of Appeals *sub silentio* assumed that jurisdiction under the APA was proper. Second, unlike the Final Interpretative Guidelines, the EEOC's NEP does not interpret the scope or provisions of any law, statutory or decisional. Rather, it simply establishes a list of priorities and, in so doing, expresses the agency's

intention to litigate claims addressing the unresolved legal issues respecting mandatory arbitration programs. Third, the NEP does not create any rights under which an employee might sue for relief, nor does it impose any definitive obligations upon employers, both of which were undisputed consequences of the Final Interpretative Guidelines, a concern which animated the District Court's decision because they exposed the employer to "countless unfounded suits by employees and their spouses seeking the pregnancy benefits they have been told they are entitled to." *Id.* at 71–72. Thus, *Newport News* does not support Circuit City's position that the NEP constitutes agency action within the meaning of the APA.

Nor does the Fourth Circuit's decision in *Food Town Stores, Inc. v. EEOC,* 708 F.2d 920 (4th Cir.1983) support a finding that the NEP is an agency rule. In *Food Town,* a Commissioner's Charge was issued and a directed investigation was commenced. *Id.* at 921. The employer named in the charge refused to cooperate with the investigation and instead sought discovery of the factual basis of the charge by seeking a subpoena compelling the testimony of the Commissioner who issued the charge. *Id.* According to the employer, such a subpoena was permissible under the plain text of a statute; however, the EEOC refused to issue the subpoena because, according to agency regulations, parties named in charges were not permitted to demand issuance of a subpoena. *Id.* Thus, in *Food Town,* the Court of Appeals had before it the refusal of the EEOC to act, *id.* at 922, and a conflict between an EEOC regulation and a statute which purported to create a right to have the agency act in a particular manner. Unlike the regulation (and the failure to act under it) in *Food Town,* the NEP does not directly conflict with any act of Congress or other controlling authority, nor is it designed to, "implement, interpret or prescribe law or policy." [27] Hence, the issuance of the NEP

---

27. Nor does the NEP describe the organization, procedure or practice requirements of the EEOC. 5 U.S.C. § 551(4). Circuit City does not contend that the NEP is an "order" within the meaning of 5 U.S.C. § 551(6).

is not a reviewable rule under the teachings of *Food Town.*

### (2) The Other Acts In the Continuum

■ This makes it necessary to assess the other acts or conduct of the EEOC to ascertain whether they are reviewable agency actions under the APA. That inquiry is best framed by considering the conduct of the EEOC after it adopted the NEP in February 1996 and before the Commission Decision was issued on July 3, 1997. In order, according to Circuit City, the EEOC's conduct included the following: (1) the decision of the General Counsel to select an appropriate corporate target for litigation over a mandatory arbitration plan; (2) the identification of Circuit City as the target and the decision of the General Counsel (pursuant to the delegation of authority in the NEP) to sue Circuit City over its AIRP; (3) selection of a venue; (4) investigating and finding putative claimants to support an action in the chosen venue; (5) structuring the litigation for consolidation with a putative private action against Circuit City; and (6) the General Counsel's approval of litigation by approval of the Presentation Memorandum on the Commissioner's Charge. None of those acts can qualify as a rule, an order, a sanction or relief, or the denial thereof,[28] as defined in the APA, and hence, standing alone, not one of those acts is an agency action (wholly apart from questions of finality) which is judicially reviewable under Section 702. Indeed, each of these acts individually, and all of them collectively, are part of the process which necessarily precedes the determination of reasonable cause reflected in the Commissioner's Decision of July 3, 1997.

More importantly, Circuit City has not cited, and the Court has not found, any authority which holds that a series of agency acts, none of which individually is an agency action, can, in the aggregate, constitute a reviewable action (which is, of course, subject to a finality determination). Considering the absence of such decisional authority and the potential disruption of agency activity which it would foster, the Court declines the invitation to create a doctrine of that species here.

However, even if these acts and conduct are construed as agency actions, they were not final actions because neither alone, nor collectively, did they have determinant consequences or deny a right. *Food Town,* 708 F.2d at 923. Of course, the mere fact that these acts occurred before the reasonable cause determination does not mean that, if they were agency actions under the APA (which they are not), they could not be final agency actions:

> [T]here is no support for the reasoning that all EEOC actions prefatory to the nonfinal reasonable cause determination are likewise nonfinal. Since finality can occur when a party is deprived of a statutory right, as well as when liability is imposed, the focus should be on the nature of the consequence accruing from the EEOC's action, not on what stage in the proceedings the action occurred. It is illogical to immunize EEOC promulgated regulations from judicial review merely because their enforcement would be prefatory to a reasonable cause determination. This is especially so where, as here, the regulation allegedly deprives a party of a statutory right, which deprivation subsequently is not reviewable in the district court trial. Thus it cannot be that federal courts lack jurisdiction over challenges to EEOC regulations.

*Food Town,* 708 F.2d at 923. However, the nature of the acts here precludes judicial review because, as a general rule, there is no independent claim against the EEOC for its commencing an investigation and/or the processing of a discrimination charge. *Bell Atlantic Cash Balance Plan v. E.E.O.C.,* 1999 WL 485679 (4th Cir. July 12, 1999). And, all of these interstitial acts are steps in the process of commencing an investigation and processing a charge.

---

28. 5 U.S.C. § 551(4), (6), (10), (11), (12).

### (3) The Failure of Conciliation

Of Circuit City's aggregation of putative agency actions, there remain two for assessment. One is the failure of conciliation which occurred by June 30, 1997. The fact is that the EEOC never seriously entertained conciliation as a prospect nor pursued it as an objective after February 1997 when the General Counsel's litigation team met with Circuit City's counsel. To be fair, Circuit City did not consider conciliation either. Hence, on the record, as the EEOC's internal documents show, conciliation had failed by June 30, 1997. That conclusion is of no import because the failure of conciliation, even if considered an agency action apart from the reasonable cause determination, was not final within the meaning of controlling Fourth Circuit authority as explained in the following section.[29]

### (4) The July 3 Commission Decision (Reasonable Cause Determination)

■ That brings the inquiry to the Commission Decision on July 3, 1997 that there was reasonable cause to believe that the AIRP violated all federal employment statutes enforced by the EEOC. That clearly is a rule for it is "an agency statement of ... particular applicability and future effect designed to implement ... law or policy." However, that agency action is not reviewable because it is not final. *Georator Corp. v. E.E.O.C.*, 592 F.2d 765 (4th Cir.1979); see *Bell Atlantic*, 1999 WL 485679.

In *Georator*, the EEOC issued an administrative subpoena in response to an employee's charge of discrimination. *Georator*, 592 F.2d at 767. Georator then filed an action against the EEOC, requesting that the subpoena be set aside. *Id.* Although the EEOC voluntarily withdrew the subpoena, it did, however, "issue[ ] a

determination of reasonable cause to believe that the charge of discrimination filed against [Georator] was true." *Id.* Georator subsequently filed an amended complaint, which only sought judicial review of the EEOC's determination of reasonable cause. *Id.*

Affirming the district court's dismissal of the action, the Fourth Circuit held that the EEOC's determination of reasonable cause to believe that an employer's practice or conduct violates federal employment law lacks the degree of finality necessary to afford a jurisdictional basis for judicial review of the agency's determination. *See id.* at 768–69. The Court of Appeals explained that "[c]ourts have long considered the touchstone of finality to be the fixing of obligations or legal relationships." *Id.* at 768. For an administrative ruling to be considered final, "it must have some 'determinate consequences for the party to the proceeding.'" *Id.* (quoting *International Tel. & Tel. Corp. v. Intern. Broth. Elec. Workers*, 419 U.S. 428, 443, 95 S.Ct. 600, 42 L.Ed.2d 558 (1975)). Thereupon, the Fourth Circuit concluded that "[n]o such finality exists with respect to the EEOC's determination of reasonable cause," *id.* because a determination of reasonable cause issued by the EEOC:

> "[s]tanding alone, [ ] is lifeless, and can fix no obligation nor impose any liability on the plaintiff. It is merely preparatory to further proceedings. *If and when the EEOC ... files suit in district court, the issue of discrimination will come to life, and the [employer] will have the opportunity to refute the charges.*"

*Id.* (emphasis added). *See also Francis-Sobel v. University of Maine*, 597 F.2d 15, 17 (1st Cir.) *cert. denied*, 444 U.S. 949, 100 S.Ct. 421, 62 L.Ed.2d 319 (1979) (no authority to review adverse EEOC determi-

---

**29.** Although Circuit City included the EEOC's Policy of July 10, 1997 in the list of events that assertedly make application of the NEP to the AIRP an agency action, Circuit City does not appear to contend that issuance of the Policy is an agency action. The Policy is, of course, not a rule even though it proscribes

the EEOC's general policy. 5 U.S.C. § 551(4). For an informative discussion of the substantive differences between an agency "rule" and "general policy" see generally *Pacific Gas & Elec. v. Federal Power Comm.*, 506 F.2d 33 (D.C.Cir.1974).

nation); *Gibson v. Missouri Pacific R.R. Co.* 579 F.2d 890, 891(5th Cir.1978) (*per curiam*), *cert. denied* 440 U.S. 921, 99 S.Ct. 1245, 59 L.Ed.2d 473 (1979)(same). Therefore, under the rule of *Georator*, there is no jurisdiction to review the EEOC's reasonable cause determination.

Circuit City, as it must, acknowledges the binding effect of *Georator*. However, Circuit City contends that *Georator* is distinguishable because it involved a reasonable cause determination on an individual charge, not on a Commissioner's Charge. That, of course, is true; but the issue is whether that distinction changes the rule of *Georator* or permits Circuit City to escape its effect.

Circuit City says that, without doubt, the reasonable cause determination made on a charge filed by an individual is lifeless and without consequence until either the charging party or the EEOC institutes litigation. But, as Circuit City contends and as this record shows, the consequences are considerably different where, as here, the determination is made on a Commissioner's Charge that is: (1) addressed to a long-standing employment practice; and (2) defines the aggrieved persons as "all employees and/or applicants who have been, or might in the future be, affected by the unlawful practice." Doc.App. at Exh. 10.

To begin, unlike an individual charge, a Commissioner's Charge cannot be withdrawn after a determination of reasonable cause is made. 29 C.F.R. § 1601.11. Thus, whether pursued or not, the reasonable cause determination in a Commissioner's Charge stands on the public record as a statement by an agency of the United States that the particular employment practice challenged is unlawful.

Second, as the EEOC acknowledges, all aggrieved persons named in the Commissioner's Charge are entitled, merely upon request, to a right to sue letter from the EEOC. *See* 29 C.F.R. § 1601.28(b). The EEOC is not free to decline that request. Here, the Commissioner's Charge defines those who may claim its benefits very broadly, including perhaps as many as 100,000 past, present and future employees. *Id.* Thus, the reasonable cause determination, standing alone, exposes Circuit City to the risk of innumerable lawsuits all over the country. That risk is a certainty in this case because the record here demonstrates that the EEOC *sua sponte* has raised charges of discrimination on the basis of the AIRP even where an employee has complained only of some other form of discrimination.[30] And, the EEOC even now is actively encouraging litigation by what it euphemistically calls "stakeholders" (its term for the plaintiffs lawyers with whom the EEOC has alliances on this matter). Multiple lawsuits undeniably present the realistic likelihood of inconsistent adjudications. Thus, the record here demonstrates that the risk of multiple and inconsistent litigation is a real and extant consequence of the Commission Decision.

Third, the reasonable cause determination made in the Commission Decision is admissible (at the discretion of the trial judge) in any civil litigation to prove that the company was on notice of the view expressed by the nation's highest employment discrimination agency that its particular employment practice was unlawful. Of course, evidence of notice can be considered as probative of punitive damages. And, that determination is not reviewable in a civil action brought by a private party pursuant to a right to sue letter issued on the reasonable cause determination.

Fourth, the reasonable cause determination on a Commissioner's Charge of this breadth calls into question the way in which Circuit City and its employees currently are resolving employment discrimination claims and how they have resolved past claims since the AIRP was adopted in 1995. Thus, the reasonable cause determi-

---

**30.** *See generally* the discussion of EEOC contacts with private counsel at note 15, *supra*. In particular, see Doc.App. at Exh. 70 (the Houston charge); Exh. 75 (the Cleveland charge); and Exhs. 81 and 82 (the Detroit charge).

nation here is having a current impact on the certainty of ongoing dispute resolution and the rights therein being sorted out.

Fifth, the EEOC, having claimed readiness to litigate in its internal documents and having threatened litigation to Circuit City, consistently has refused to join issue to allow a judicial decision on the reasonable cause determination. The EEOC was offered the opportunity voluntarily to join this action or to bring a counterclaim in it and was told that, if the agency took that course, the case would be given priority on the docket. The EEOC rejected that opportunity. Also, the EEOC resolutely resisted the motion of Circuit City, as well as the entreaties of the plaintiff in the action, to compel joinder of the agency as a plaintiff in the related case, *Greenhill v. Circuit City Stores, Inc.*[31] Thus, the EEOC, having thrown down the gauntlet of threatened litigation, has reversed course on its zeal for litigation and, in so doing, has denied Circuit City an opportunity to secure a judicial determination of this important issue.

And, that persistent refusal to bring its position on for judicial resolution is based on the views of the EEOC's General Counsel that this Court and the Fourth Circuit are not a favorable forum for the EEOC's position.[32] Of course, like all litigants the EEOC is entitled to consider such matters as venue in formulating litigation strategy, and so the agency cannot be faulted for taking that matter into account. However, the EEOC's legitimate interest in venue considerations long ago evolved into an unthinking, obdurate obsession to avoid litigation in this circuit no matter what the consequences to Circuit City or the tens of thousands of its employees who are governed by the AIRP. Having readied itself for litigation, having made a decision on a

Commissioner's Charge that Circuit City's AIRP violates all of the employment discrimination laws which the EEOC enforces (and thereby exposing Circuit City to the consequences outlined above), having threatened Circuit City with litigation, and, within days thereafter, having prescribed an official agency policy on the matter, it is unreasonable and capricious for the EEOC to resist efforts to have its determination settled by the courts, especially where, as here, the consequences are known by the agency to have implications for tens of thousands of people.

Contrary to the EEOC's assertion, the validity of the AIRP will not be settled by the Fourth Circuit's decision in *Johnson v. Circuit City Stores, Inc.*, appeal docketed, No. 94–1449 (4th Cir. April 7, 1999). In *Johnson,* the district court held that Circuit City's AIRP was invalid as to an employment discrimination claim brought under 42 U.S.C. § 1981. Of course, § 1981 is neither within the enforcement authority of the EEOC nor addressed by the July 3 reasonable cause determination. Hence, although the decision in *Johnson* no doubt will be instructive, it will not be dispositive.

■ For the foregoing reasons, the EEOC's reasonable cause determination has determinant consequences to Circuit City if that term is construed to include practical consequences of legal significance which flow from the agency action. That those consequences are as of now inchoate (largely because of the pendency of this action) does not make them any less the result of the agency's action or any less real. However, the Fourth Circuit has defined "determinant consequences" to mean the "fixing of obligations or legal relationships" or as "imposing liability on the plaintiff." *Georator*, 592 F.2d at 768.

---

**31.** Docket No. 3:98CV375. Over the plaintiff's objections—solely on the grounds that the AIRP was not invalid as contrary to public policy for requiring arbitration rather than litigation or as unsupported by consideration (the only basis' asserted by the plaintiff), the Court granted Circuit City's motion to compel arbitration under the AIRP.

**32.** The EEOC argues that its decision not to pursue litigation with Circuit City was motivated by a favorable Ninth Circuit decision in *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182 (9th Cir.1998). That argument is unconvincing given that *Duffield* was not decided until May 1998 and this case was filed in July 1997.

The definition of *Georator* is the law in this circuit and it does not lie within the province of a district court to conclude otherwise. And, it appears that, in *International Tel. & Tel. Corp. v. Local 134, Intern. Broth. Elec. Workers*, 419 U.S. 428, 95 S.Ct. 600, 42 L.Ed.2d 558 (1975), the decision on which *Georator* was based, the Supreme Court foreclosed from the realm of "determinant consequences" the kinds of real, and quite serious, practical consequences wrought by agency actions such as the reasonable cause determination and the EEOC's conduct in respect of it.

Circuit City also seeks to circumvent the effect of the decision in *Georator* by arguing that it was modified by the decision in *Arch Mineral Corp. v. Babbitt*, 104 F.3d 660 (4th Cir.1997) wherein the Fourth Circuit adopted "a functional approach in resolving" the issue of finality in a ripeness inquiry. *Arch Mineral* is distinguishable because there the agency had adjudicative powers (which the EEOC does not) and the agency's decision had fixed obligations and legal relationships and imposed liability on the plaintiff, all within the definition of "determinant consequences" used in *Georator*.

Thus, it is *Georator's* definition of determinant consequences as applied to a reasonable cause determination issued by the EEOC that bars a finding of finality. That definition is the controlling one and cannot be revisited here.

### (5) The Threat of Litigation

■ Circuit City's claim of reviewability is also based on the threat (in the July 3 Commission Decision) by the EEOC to institute litigation if Circuit City did not disestablish its AIRP in fourteen days. However, a threat to institute enforcement proceedings is not a final agency action (even if it is an agency action within the APA) and hence, there is no jurisdiction to review an agency's "threat of litigation." See *CSG Exploration Co. v. F.E.R.C.*, 930 F.2d 1477, 1483–84 (10th Cir.1991)

(FERC's threat of possible application of new tests to gas producers which would impose economic disadvantage not ripe for review); *Greater Detroit Resource Recovery Authority v. E.P.A.*, 916 F.2d 317, 322 (6th Cir.1990) (EPA's threat to revoke permit did not constitute final agency action for judicial review purposes); *Duval Ranching Co. v. Glickman*, 965 F.Supp. 1427, 1442 (D.C.Nev.1997) (agency's threat to file complaint not final action thus not reviewable); *Saratoga Sav. and Loan Ass'n v. Federal Home Loan Bank of San Fran.*, 724 F.Supp. 683, 687 (N.D.Cal.1989) (mere threat of future agency action does not, in and of itself, constitute final agency action, hence not reviewable).

Of course, the threat of litigation here is merely part of the reasonable cause determination and, even if otherwise reviewable as an agency action, it would not be final under *Georator*.

### CONCLUSION

For the foregoing reasons, neither the issuance of the NEP nor the acts occurring between the time it was published and before the July 3 Commission Decision, whether considered individually or collectively, qualify as agency action within the meaning of the APA. And, under *Georator*, the July 3 Commission Decision, albeit an agency action, is not final and hence may not be reviewed under the APA. Nor is the threat to commence litigation a final agency action (even if it is considered an agency action). Because the only waiver of sovereign immunity available to remove the bar to suit against the United States in this action is to be found in the APA and because there is no agency action reviewable under the APA, the Court lacks subject matter jurisdiction over the action.[33] The Court, however, retains jurisdiction to adjudicate Circuit City's motion for sanctions and to assess the propriety of other remedial measures arising out of the misrepre-

---

**33.** This resolution makes it unnecessary to consider the other aspects of the EEOC's mo-

tion to dismiss.

sentations outlined in the Memorandum Opinion of October 1, 1999 and otherwise presented by the record herein.[34] Accordingly, the EEOC's renewed motion to dismiss the action without prejudice is GRANTED and, pursuant to Fed.R.Civ.P. 54(b), the Court finds that there is no just reason for delay in the entry of judgment dismissing, for lack of jurisdiction, the declaratory judgment claim and judgment on it is hereby entered notwithstanding the retention of jurisdiction for the previously described limited purposes. In addition, Circuit City's motion for summary judgement is DENIED AS MOOT.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

**34.** A court has inherent jurisdiction to determine jurisdiction and where allegedly sanctionable conduct occurs during the exercise of that inherent jurisdiction, the court retains authority to address the question of sanctions.