**SYNGENTA CROP PROTECTION, INC., Plaintiff,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Christine Todd Whitman, Defendants.**

**No. 1:02CV00171.**

United States District Court, M.D. North Carolina.

April 11, 2002.

R. Howard Grubbs, Amy L. Bircher, Womble Carlyle Sandridge & Rice, PLLC, Winston-Salem, NC, Kathryn E. Szmusz-kovicz, Harold L. Segall, Stephen Arner, Beveridge & Diamond, P.C., Washington, DC, for plaintiff.

Gill P. Beck, John W. Stone, Jr., Office of U.S. Atty., Greensboro, NC, for defendant.

## AMENDED MEMORANDUM OPINION

TILLEY, Chief Judge.

Plaintiff Syngenta Corp Protection, Inc. ("Syngenta"), filed suit against Defendant United States Environmental Protection Agency ("EPA") for violation of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). 7 U.S.C. §§ 136 et seq. (1999). This case is before the Court on Syngenta's Motion for a Preliminary Injunction [Doc. # 3] and request for a stay

pending appeal. For the reasons set forth below, Plaintiff's motion is DENIED. Furthermore, Syngenta's request for a stay pending appeal is DENIED and the temporary restraining order is DISSOLVED.

## I.

### A.

FIFRA requires that any pesticide sold or distributed in the United States be registered with the EPA. FIFRA § 3(a), 7 U.S.C. § 136a(a) (1999). In order to register a pesticide with the EPA, an applicant must provide numerous studies to determine the effect of the pesticide on the environment, among other things. FIFRA § 3(c)(1)(F), 7 U.S.C. § 136a(c)(1)(F) (1999). These studies can be quite costly, potentially costing tens of millions of dollars. Registering a pesticide thus often requires a large investment in research and development.

If future applicants were allowed to rely on studies in previous registration applications without restriction, companies might be deterred from making large investments in providing new, more desirable products. In order to protect the original registrant and encourage the creation of the numerous required studies and the development of new pesticides, Congress enacted an exclusive use provision that entitles first registrants of a new active ingredient to a ten-year period of "exclu-

sive use" of their study data. FIFRA § 3(c)(1)(F)(i), 7 U.S.C. § 136a(c)(1)(F)(i) (1999).[1] This period of "exclusive use" prohibits other registrants from relying on the original registrant's studies in obtaining a new registration for the same active ingredient. *Id.* Not all data submitted by an applicant will be considered as exclusive use data. For example, "defensive data" would not be considered exclusive use material. *Id.*

In order to more fully define the exclusive use provision, the EPA promulgated 40 C.F.R. § 152.83(c). Section 152.83(c) sets out the three criteria necessary for data to be considered "exclusive use study" material as is required under 152.116(a) to be eligible for protection. Section 152.83(c) requires that:

(1) The study pertains to a new active ingredient ... or new combination of active ingredients ... first registered after September 30, 1978;

(2) The study was submitted in support of, or as a condition of approval of, the application resulting in the first registration of a product containing such new chemical or new combination (first registration), or an application to amend such registration to add a new use; and

(3) The study was not submitted to satisfy a data requirement imposed under FIFRA section 3(c)(2)(B) [7 U.S.C. § 136a(c)(2)(B) ].

---

1. Section 136a(c)(1)(F)(i) states that:

 With respect to pesticides containing active ingredients that are initially registered under this subchapter after September 30, 1978, data submitted to support the application for the original registration of the pesticide, or an application for an amendment adding any new use to the registration and that pertains solely to such new use, shall not, without the written permission of the original data submitted, be considered by the Administrator to support an applica-

tion by another person during a period of ten year following the date the Administrator first registers the pesticide, except that such permission shall not be required in the case of defensive data.
7 U.S.C. § 136a(c)(1)(F)(i).
 The EPA has promulgated various regulations pursuant to § 136a(c)(F)(i). Among the regulations are 40 C.F.R. §§ 152.116(a) and 152.83(a), which are discussed more fully *infra.*

This regulation intended to explain what material would be considered exclusive use data.

Registrants with exclusive use data are protected by FIFRA regulations that require the EPA to give thirty-days advance notice "before registration of a product containing an active ingredient for which a previously submitted study is eligible for exclusive use...." 40 C.F.R. § 152.116(a). This notice is intended to give a registrant with exclusive use rights the ability to petition the EPA to deny registration as well as to create an administrative record for review. 40 C.F.R. § 152.116(b). The regulations, however, only require notice if the EPA has determined that the data is eligible for exclusive use protection. *Id.* at § 152.116(a).

Although FIFRA requires an original applicant to provide its own data prior to registration, FIFRA also provides an alternative method of registration for subsequent applicants, known as conditional registration. FIFRA § 3(c)(7), 7 U.S.C. § 136a(c)(7) (1999). One circumstance in which the EPA may grant a conditional registration is if

> (i) the pesticide and proposed use are identical or substantially similar to any currently registered pesticide and use thereof, or differ only in ways that would not significantly increase the risk of unreasonable adverse effects on the environment, and (ii) approving the registration or amendment in the manner proposed by the applicant would not significantly increase the risk of any unreasonable adverse effect on the environment.

FIFRA § 3(c)(7)(A), 7 U.S.C. § 136a(c)(7)(A) (1999). This type of condi-

tional registration is often referred to as a "me-too" or "follow-on" registration because of the similarities between the new application and the existing registration. "Me-too" applicants can meet FIFRA's data requirements by providing new data itself, by the "cite-all" method in which the applicant makes a general citation to all of the EPA's files, or by using the selective cite method in which the applicant selectively cites the data of others. 40 C.F.R. § 152.86 (cite-all method); 40 C.F.R. § 152.90 (selective method). In order to obtain a conditional registration, however, the registration for the original pesticide must still be active.

### B.

Syngenta manufactures and distributes pesticides. Syngenta originally marketed pesticides with the active ingredient metolachlor, which it registered with the EPA pursuant to FIFRA. After the passage of the Reduced Risk Initiative, however, Syngenta decided to pursue manufacturing and distributing pesticides containing a potentially less harmful active ingredient, S-metolachlor.[2] Syngenta had known for some time that a given amount of S-metolachlor was more effective than an equal amount of metolachlor and that, since application rates could be reduced, it would be a more environmentally friendly herbicide. Syngenta, however, did not have the technology to make production of S-metolachlor commercially feasible. Syngenta endeavored to research S-metolachlor further and eventually, in 1997, found a method in which the marketing of S-metolachlor would be commercially feasible. Syngenta then successfully registered the new S-metolachlor active ingredient.

---

**2.** Metolachlor contains two isomers: an S isomer and an R isomer. Syngenta has determined that the S-metolachlor is far more effective than the R-metolachlor and that by

omitting most of the R-metolachlor, the S-metolachlor may be used with equal efficiency in application amounts 25% less than the standard metolachlor.

Although the EPA granted Syngenta's registration of S-metolachlor, it requested that Syngenta voluntarily cancel its metolachlor registrations in order to motivate pesticide consumers to use the new, less polluting pesticide. Syngenta complied with the request by ceasing the manufacture and sale of metolachlor. The EPA then publicly announced the proposed cancellation of all metolachlor registrations on December 27, 1999 and stated that the cancellation would be effective June 26, 2000. Syngenta then ceased paying the registration fees for its metolachlor registrations. To this date, the EPA has not officially cancelled all of Syngenta's metolachlor registrations.

Shortly after the EPA announced the proposed cancellation of all metolachlor registrations, Cedar Chemical Corp. applied for a registration of metolachlor. Cedar's application was followed by applications to register metolachlor from Sipcam Agro USA, Inc., and Drexel Chemical Corp. According to Syngenta, none of the three applicants has provided the required data to obtain a metolachlor registration. Syngenta contends that it has produced the only data that could satisfy the EPA's requirements for data on the Avian Reproductive Study of the Bobwhite Quail, the Acute Mysid Shrimp Study, the Fathead Minnow Life–Cycle and Early Life Stage Study, and data on ecological effects. Syngenta points out that it provided these studies in its application for registration of S-metolachlor and that the EPA has determined that, because of the similarity between metolachlor and S-metolachlor, the S-metolachlor studies would be sufficient to satisfy the required studies for metolachlor.[3] Syngenta thus argues that the

three metolachlor applicants and the EPA must be improperly relying on its S-metolachlor studies to satisfy the requirements for the metolachlor registrations. Syngenta claims that such a use would violate its exclusive use protections under 40 C.F.R. § 152.116(a). Syngenta has thus filed petitions with the EPA to deny all three pending registration applications.

Syngenta also contends that any conditional registration of metolachlor would be procedurally improper. Syngenta argues that its metolachlor registration should have been cancelled because of its request, its failure to pay registration fees, and the EPA's public announcement of the proposed cancellation. If the original metolachlor registration is cancelled, none of the conditional applicants' requests can be granted because the regulations allowing consideration of those applications require that a registration with the same active ingredient exist. Syngenta posits that the EPA has failed to officially cancel its metolachlor applications in order to give its competitors an advantage and allow them to be registered without meeting the rigorous standards required for original registrants.

The EPA has sent Syngenta correspondence regarding the action it will take in response to the cancellation request. On December 5, 2000, the EPA informed Syngenta that it would provide seven-days advance notice of any action on Syngenta's cancellation request. The EPA further noted that it would act on Cedar's application "no sooner than" it acted on the cancellation request. On March 4, 2002, the EPA sent Syngenta a letter purporting to give the seven-days advance notice promised in the December letter. Syngenta

---

3. Scientists in the EPA have determined that some S-metolachlor data can be used to satisfy the requirements for metolachlor because of the similarity of the active ingredients.

This position was stated in a memorandum dated February 28, 2002, which is discussed further below.

interprets the March 4 letter to state that the EPA will act on Cedar's registration on March 11, 2002. Syngenta contends that such action would violate its right to notice under 40 C.F.R. § 152.116(a) which provides thirty-days advance notice before the registration of an active ingredient for which there is data entitled to exclusive use.

After receiving the March 4 letter, Syngenta filed its Complaint and requested, among other things, a temporary restraining order and a preliminary injunction. Syngenta claimed jurisdiction under FIFRA. FIFRA §§ 16(a) and 16(c), 7 U.S.C. §§ 136n(a) and 136n(c) (1999). On March 8, 2002, a temporary restraining order was issued for ten days or until the Court dissolved the order. Hearings on the preliminary injunction were held on March 8, 2002 and from March 11 through March 13, 2002.

## II.

The EPA alleges that there is no subject matter jurisdiction to support Syngenta's action. First, the EPA contends that Congress did not intend for 7 U.S.C. § 136n(c) to confer jurisdiction on private citizens or registrants to sue the government. Second, the EPA contends that the case is not ripe for review under Syngenta's alternate basis for jurisdiction, § 136n(a). The first contention is supported by the law and the second contention is supported by the facts.

## A.

■ The EPA first argues that Congress did not explicitly waive sovereign immunity in § 136n(c), therefore precluding judicial review of Syngenta's claim against the government under this provision. Syngenta, however, contends that § 136n(c) confers jurisdiction on this Court to restrain or prevent the EPA from violating FIFRA. Syngenta relies on the face of the statute as well as numerous cases to support its position. *See Turner v. United States E.P.A.*, 848 F.Supp. 711, 715–16 (S.D.Miss.1994); *Eli Lilly & Co. v. United States E.P.A.*, 615 F.Supp. 811, 814–18 (S.D.Ind.1985); *Rohm & Haas Co. v. United States E.P.A.*, 525 F.Supp. 921 (E.D.Pa.1981), *aff'd* 651 F.2d 176 (3d Cir. 1981); *Dow Chem. Co. v. Costle*, 464 F.Supp. 395 (E.D.Mich.1978); *Chevron Chem. Co. v. Costle*, 499 F.Supp. 732 (D.Del.1980), *aff'd on other grounds*, 641 F.2d 104 (3d Cir.1981); *Mobay Chem. Corp. v. Costle*, 447 F.Supp. 811, 813–14, 827 n. 22 (W.D.Mo.1978); *Dow Chem. Co. v. Train*, 423 F.Supp. 1359, 1363, 1372 (E.D.Mich.1976); *Mobay Chem. Corp. v. Train*, 394 F.Supp. 1342, 1343 (W.D.Mo. 1975). The EPA replied that none of the above cases correctly analyzed sovereign immunity, all of the cases involved final agency actions in which jurisdiction would have been appropriate under § 136n(a), and many of the cases preceded the 1978 Amendments to FIFRA.

■ A waiver of sovereign immunity requires an unequivocal expression in the text of the statute. *Lane v. Pena*, 518 U.S. 187, 192, 116 S.Ct. 2092, 2096, 135 L.Ed.2d 486 (1996); *Williams v. United States*, 242 F.3d 169, 172 (4th Cir.2001). Furthermore, "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane*, 518 U.S. at 192, 116 S.Ct. at 2096. Legislative history cannot supplement the statutory text and provide a waiver when the text of the statute does not clearly state that sovereign immunity has been waived. *Lane*, 518 U.S. at 192, 116 S.Ct. at 2097; *United States v. Nordic Village, Inc.*, 503 U.S. 30, 37, 112 S.Ct. 1011, 1016, 117 L.Ed.2d 181 (1992); *Circuit City Stores v. Equal Employment Op-*

*portunity Commission,* 75 F.Supp.2d 491, 503 n. 20 (E.D.Va.1999).

Section 136n(c) states that "[t]he District Courts of the United States are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of [FIFRA]." Unlike § 136n(a) which specifically waives sovereign immunity for final agency actions, among other things, § 136n(c) does not explicitly state that the government may be sued. Section 136n(c) does not mention whether the United States or its agencies may be sued. Instead, it simply states that district courts may adjudicate the enforcement or prevention or restraint of violations of FIFRA. Simply stated, the statute fails to unequivocally express that the government may be sued under § 136n(c).

■ The statute's inclusion of § 136n(a) also belies the argument that § 136n(c) constitutes a waiver of sovereign immunity. Section 136n(a) states that, "the refusal of the Administrator to cancel or suspend a registration or to change a classification not following a hearing and other final actions of the Administrator not committed to the discretion of the Administrator by law are judicially reviewable by the district courts of the United States."[4] Both § 136n(c) and § 136n(a), however, must be read together. *See Bennett v. Spear,* 520 U.S. 154, 173, 117 S.Ct. 1154, 1166, 137 L.Ed.2d 281 (1997) (stating that "[i]t is the " 'cardinal principle of statutory construction … [that] [i]t is our duty to

"give effect, if possible, to every clause and word of a statute" … rather than to emasculate the entire section.' ") (internal citations omitted). If § 136n(c) was read as Syngenta suggests, the requirement of final agency action in § 136n(a) would be superfluous. There would be no need to specify in § 136n(a) that certain final agency actions were justiciable if § 136n(c) covered the enforcement of FIFRA and the prevention or restraint of all FIFRA violations, either final or non-final, because any of the Administrator's actions apparently in conflict with provisions of the statute and regulations would ostensibly be characterized as violations of FIFRA by plaintiffs. When analyzing one part of a statute, it is necessary to view the statute as a whole. *Bennett,* 520 U.S. at 173, 117 S.Ct. at 1166. When looking at both § 136n(c) and § 136n(a) together, it is clear that § 136n(c) was not intended to waive sovereign immunity.

■ Syngenta's reliance on district court cases is misplaced because most of the cases involve situations in which the plaintiff could have also asserted jurisdiction successfully under § 136n(a).[5] Furthermore, Syngenta's reliance on *Eli Lilly & Co. v. United States E.P.A.* is unpersuasive because that court undertook an erroneous analysis of sovereign immunity. Although *Lilly* discussed the plain language of the statute, it supplemented its analysis by looking at FIFRA's legislative history. When determining whether the government has waived sovereign immunity, it is

4. Syngenta filed an Amended Complaint on March 12, 2002 which included claims for substantive and procedural due process as well as a claim for mandamus to require the EPA to act on Syngenta's voluntary cancellation request of metolachlor. Counsel for Syngenta, however, represented that it was not seeking a preliminary injunction based on the additional grounds for relief at this time. It is therefore unnecessary to determine whether

the Court would have jurisdiction over Syngenta's new claims at this time.

5. Many of the district court cases cited by Syngenta involve final agency actions in which the EPA had already registered the disputed pesticides. Section § 136n(a) waives sovereign immunity for final agency actions. Those cases thus would be properly before district courts because of the final agency action involved.

inappropriate to look at such legislative history as the source of a waiver of sovereign immunity. *Lane,* 518 U.S. at 192, 116 S.Ct. at 2097; *Circuit City Stores,* 75 F.Supp.2d at 503 n. 20. None of the other district court cases cited by Syngenta engage in a thorough review of whether § 136n(c) constitutes a waiver of sovereign immunity. Because the text of § 136n(c) does not unequivocally waive sovereign immunity and because applying it as Syngenta argues would render the requirement of "final action" in § 136n(a) superfluous, the Court lacks jurisdiction under § 136n(c).[6]

### B.

■■■ The EPA next challenges Syngenta's jurisdictional basis under § 136n(a). While the EPA concedes that § 136n(a) explicitly waives sovereign immunity, it argues that the EPA has not taken any final agency action and thus the case is not ripe for review under § 136n(a). To determine whether a pre-enforcement agency action is ripe for review, courts "must 'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Virginia Soc'y for Human Life, Inc. v. Federal Election Commission,* 263 F.3d 379, 390 (4th Cir.2001) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)); *Ciba–Geigy Corp. v. United States E.P.A.,* 801 F.2d 430, 434 (D.C.Cir.1986). When determining whether a case is fit for

judicial decision, courts should analyze whether the issue is purely legal, whether the consideration of the issue would be better served in a more complete setting, and whether the agency's action is indeed final. *Abbott Labs.,* 387 U.S. at 149–52, 87 S.Ct. at 1515–17; *Ciba–Geigy,* 801 F.2d at 435. Syngenta argues that the case is ripe for review based on two allegedly final agency actions.

i.

■■ First, Syngenta contends that the EPA has taken final agency action by definitively interpreting 40 C.F.R. § 152.116(a). As noted above, § 152.116(a) requires the EPA to provide thirty-days advance notice before registering a product that includes "an active ingredient for which a previously submitted study is eligible for exclusive use...." 40 C.F.R. § 152.116(a). Syngenta alleges that the EPA has interpreted this regulation to mean that only data that is entitled to exclusive use warrants notice, as opposed to Syngenta's belief that the regulation applies to any data *eligible* for exclusive use protection. Syngenta contends that EPA counsel's statements in briefs in the instant case and a previous case in the Western District of Tennessee[7] demonstrate this interpretation. The EPA's brief in the instant case states that notice under 40 C.F.R. § 152.116(a) "is to occur only if the Agency first makes a determi-

---

**6.** Even if § 136n(c) was found to waive sovereign immunity, the use of the word "violation" would include only final agency actions. In *Bennett,* the Supreme Court noted that defining the word "violation" as any administrative errors would abrogate the final agency action requirement of the Administrative Procedure Act. *Bennett,* 520 U.S. at 174, 117 S.Ct. at 1167. Section 136n(c) would therefore give no more access than would § 136n(a). Furthermore, as discussed *infra,* the EPA has not yet taken any final agency action and thus, even if § 136n(c) did waive

sovereign immunity, the case would not be ripe for review.

**7.** Cedar, one of the applicants desiring to register metolachlor, previously filed suit in the Western District of Tennessee in an effort to force the EPA to issue the registration. Cedar's claims were dismissed in that case. *See Cedar Chem. Corp. v. U.S. E.P.A.,* Civ. Action No. 01–2547 GA (W.D.Tenn. Aug. 10, 2001).

nation that the data at issue is *entitled* to exclusive use protection. . . ." Defendant United States Environmental Protection Agency's Opposition to Syngenta Crop Protection, Inc.'s Application for Temporary Restraining Order, at 24 (emphasis added). The filings from the Tennessee litigation have not been provided to the Court. Syngenta, however, did read from the filings and represented that in one brief, EPA's counsel reiterated its stance that notice is only required if the data is *entitled* to exclusive use protection. In the other filing, however, Syngenta represented on the record that EPA's counsel stated that notice would be provided if the EPA determined that a previously submitted study is *eligible* for exclusive use protection.[8]

 Although the EPA's interpretation of FIFRA regulations involves a purely legal question, this agency action is not ripe for review because it is not final agency action.[9] A determination of whether an act constitutes final agency action requires analysis of two factors. First, "the action must mark the 'consummation' of the agency's decisionmaking process." *Bennett*, 520 U.S. at 177, 117 S.Ct. at 1154; *COMSAT Corp. v. National Science Found.*, 190 F.3d 269, 274 (4th Cir.1999). Second, the act must determine rights and obligations or be of a nature such that legal consequences will result from the action. *Bennett*, 520 U.S. at 177, 117 S.Ct.

at 1154; *COMSAT*, 190 F.3d at 274. EPA's counsel's remarks that notice would not be required unless the data in question is *entitled* to exclusive use protection as opposed to *eligible* for exclusive use protection is insufficient to constitute final agency action. First, EPA's counsel's statements regarding § 152.116(a) vary in its court filings. Although two briefs do state that notice should not be granted unless the data is *entitled* to exclusive use protection, a third filing, as represented by Syngenta's counsel, stated that the notice would be granted if the data was *eligible* for exclusive use protection. There is thus no consistency among EPA counsel's statements to the Court sufficient to constitute a final action which consummated the EPA's decisionmaking process.

EPA counsel's statements also do not constitute final agency action because the statements were made in support of the EPA and there is nothing on the record to establish that the EPA itself endorsed the statements. In support of its position that counsel's statements in court can be deemed the agency's final position, Syngenta relies on *Auer v. Robbins*, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), and *Molinary v. Powell Mountain Coal Co., Inc.*, 125 F.3d 231, 235 n. 4 (4th Cir. 1997). These cases, however, are distinguishable. The interpretation provided to the Court in *Auer* was presented in an amicus brief that the Supreme Court re-

---

**8.** We do not reach the issue of whether the EPA's interpretation of "eligible" is arbitrary and capricious because Syngenta has not demonstrated that the EPA has made a final agency interpretation of 40 C.F.R. § 152.116(a). If, however, the EPA did interpret "eligible" as "entitled to," as Syngenta suggests, it is unclear that such an interpretation would be erroneous. Eligible is defined as "fit or proper to be chosen; worthy of choice; desirable" or as "meeting the stipulated requirements, as to participate, compete, or work; qualified." *Webster's New*

*Universal Unabridged Dictionary* 632 (Deluxe Ed.1996). Entitled is defined as "to give . . . a title, right, or claim to something; furnish with grounds for laying claim." *Id.* at 649. Furthermore, "qualify" is a synonym for entitled. *Id.* The definitions of eligible and entitled thus appear to be quite similar, especially because the word qualified is used both to define eligible and as a synonym for entitled.

**9.** An agency's interpretation of the law can be agency action. *Ciba–Geigy*, 801 F.2d at 435.

quested to clarify the Agency's position. This is not the case here. *Molinary* is similarly distinguishable because it involved statements in an agency's amicus brief that "espouse[d]" an interpretation. *Molinary,* 125 F.3d at 235. Furthermore, *Molinary* quotes the portion in *Auer* in which the Supreme Court noted that there was no reason to suspect that the interpretation in the brief was not the true interpretation of the agency. *Id.* at 235, n. 4. As noted above, the statements in EPA's counsel briefs do not purport to be the definitive agency interpretation and there is no basis to conceive that the expression constituted the agency's definition instead of counsel's paraphrasing. Without more, it must be viewed that the Department of Justice is thus acting as an advocate and not as the agency itself. Syngenta noted that it has no information that the EPA has interpreted § 152.116(a) in the past. Counsel for the EPA represented that no final determination had been made as to whether Cedar's metolachlor application should be allowed or whether Syngenta would be entitled to the thirty-day notice provision under § 152.116(a). There is thus no basis to find that the EPA has taken final agency action to interpret § 152.116(a).

ii.

Syngenta next contends that its request for a preliminary injunction is ripe for review on its contention that the EPA has refused to provide notice under § 152.116(a) if it determines that Syngenta's data is eligible for exclusive use protection. Syngenta alleges that the EPA has already decided to deny Syngenta notice, as demonstrated by three pieces of EPA correspondence. In the first letter, dated December 5, 2000, the EPA informed Syngenta that it would give seven days advance notice of its decision on Syngenta's request for voluntary cancellation.

Ex. S28. The EPA further stated that it would not give advance notice of its decision on Cedar's application to either Syngenta or Cedar. Finally, the EPA stated that it would act on Cedar's registration "no sooner than" it publicly announced its decision on Syngenta's voluntary cancellation request.

The second document that Syngenta relies upon is a memorandum from EPA scientists dated February 28, 2002. The memorandum states that S-metolachlor studies have been used to fill data gaps in the metolachlor applications. The memorandum, however, did not state that the studies were protected by FIFRA's exclusive use provisions.

Finally, the letter dated March 4, 2002, informed Syngenta that the EPA would issue a decision on Syngenta's request for voluntary cancellation "no sooner than" March 11, 2002. Ex. S29. The EPA stated that the letter served as the notice promised in the December 5, 2000 letter. The EPA further stated that it would issue a decision on Cedar's application "no sooner than" March 11, 2002, as indicated in the December 5 letter. At the March 8, 2002 hearing on the issue of a temporary restraining order, counsel for the EPA represented that although the EPA's decision might not come on March 11, 2002, it would be made within seven to ten days afterwards if the agency was not restrained.

Syngenta contends that the correspondence, taken as a whole, demonstrates that the EPA has already decided to use Syngenta's exclusive use data and intends to give only seven days notice as opposed to the required thirty-day notice. Syngenta argues that the "no sooner than" language in the December 5 and March 4 letters clearly indicates that the EPA was planning on registering Cedar's application on March 11, 2002.

Although the letters are poorly worded, they do not, as Syngenta contends, represent final agency action that is ripe for judicial review. The letters do not state that the EPA is refusing to give thirty-days notice if it determines that the data in question is eligible for exclusive use protection. Instead, the letters represent the EPA's attempt to comply with its gratuitous promise of seven days notice of Syngenta's voluntary cancellation.[10] The February 28, 2002 memorandum does not express an opinion as to whether the data in question is entitled to exclusive use protection. Clearly if the EPA determined that the data was not eligible for protection, it would be under no obligation to issue any notice of the data's use.

The letters and memorandum do not mark the consummation of the EPA's decisionmaking process. Even after writing the letters, the EPA could still determine that Syngenta's data is eligible for exclusive use protection and issue the requisite thirty-days notice. Nothing in the letters or memorandum forecloses the possibility that the EPA will take such action. Further, the EPA could potentially decide to allow Syngenta's voluntary cancellation request at which point Cedar's application would be denied. Because the EPA still has the option of providing the thirty-days notice if it determines that Cedar's application does "contain[ ] an active ingredient for which [Syngenta's] submitted study is eligible for exclusive use," the letters are not binding. Furthermore, the letters do not actually state that the EPA is refusing

to give the required thirty-day notice. Because the EPA has not stated that it will not give Syngenta thirty-days notice if it determines that the data is eligible for exclusive use, there has been no final agency action and the case is not ripe for review.[11]

### III.

■ An analysis of the merits of Syngenta's motion for a preliminary injunction is included for two reasons. The plaintiff wishes to seek immediate relief in the Fourth Circuit and should the Fourth Circuit analyze the jurisdictional questions differently it will not have to await a further consideration of the substantive question. Also, Syngenta has asked in this Court for a stay pending appeal pursuant to Rule 8(a)(1) of the Rules of Appellate Procedure. The test for granting a stay mirrors that in determining whether to issue a preliminary injunction. *See Long v. Robinson,* 432 F.2d 977 (4th Cir.1970).

■ Preliminary injunctions are an extraordinary remedy only to be granted in exceptional circumstances. *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 1867, 138 L.Ed.2d 162 (1997); *MicroStrategy, Inc. v. Motorola, Inc.,* 245 F.3d 335, 339 (4th Cir.2001). As Judge Russell observed in *Direx Israel Ltd. v. Breakthrough Medical Corp.:*

The standard for preliminary injunctions is established in this Circuit by *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir.1977). Blackweld-

---

**10.** FIFRA does not require the EPA to issue any notice in advance of acting on voluntary cancellation requests.

**11.** Syngenta argues that letters from an agency can constitute final agency action, as noted in *Ciba–Geigy.* Although it is true that a letter can communicate final agency action, the correspondence in the instant case is quite different than the letter in *Ciba–Geigy.* In *Ciba–*

*Geigy,* the EPA explicitly informed Ciba–Giegy of its interpretation of a specific FIFRA regulation. *Ciba–Geigy,* 801 F.2d at 433. Furthermore, the letter in *Ciba–Geigy* required "immediate compliance." *Id.* at 437. In the instant case, however, the correspondence is far from clear and does not require Syngenta to undertake any action.

er clarified that a hardship balancing test applies to determine the granting or denial of a preliminary injunction.... Four factors must be considered:

(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,

(2) the likelihood of harm to the defendant if the requested relief is granted,

(3) the likelihood that the plaintiff will succeed on the merits, and

(4) the public interest.

... The irreparable harm to the plaintiff and the harm to the defendant are the two most important factors. Further, the '[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction.' ... The 'likelihood of irreparable harm to the plaintiff' is the first factor to be considered in this connection. We naturally begin our analysis with that issue because " '[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.' " ... The applicability of this principle has often been affirmed in cases involving motions for preliminary injunctions.... We reaffirmed this requirement of a clear showing of irreparable harm as a condition for the grant of a preliminary injunction in *Rum Creek:* 'To succeed the Company must show that it will sustain irreparable harm without a preliminary injunction. The "balance of hardship" test does not negate the requirement that the [movant] show some irreparable harm.' Moreover, the required 'irreparable harm' must be 'neither remote nor speculative, but actual and imminent.'

952 F.2d 802, 812 (4th Cir.1991) (internal citations omitted).

The parties agree that, should the EPA allow Cedar's application to register metolachlor, Syngenta will have a right of judicial review including the right to seek injunctive relief. There is no reason to believe that if the decision is not made in accordance with the statute and regulations and that if Syngenta's exclusive use data should be used in derogation of 7 U.S.C. § 136a(c)(1)(F)(i), 40 C.F.R. § 152.116(a), and § 152.83(c) in the decision to register Cedar's metolachlor application, a reviewing court would lack the authority to enjoin Cedar's manufacture or sale of metolachlor until the EPA, on remand, makes a registration decision in accord with statutory and regulatory requirements.

In determining whether Syngenta has made a clear showing of irreparable harm should a preliminary injunction not be granted at this time, the quantification of harm must relate only to the injury occasioned by the bare decision to register metolachlor. Other than competing for market share with other metolachlor providers, Syngenta's only other identified harm is a claimed loss of credibility in the marketplace. Syngenta claims that its credibility will be greatly impacted if the EPA is allowed to register Cedar's application because Cedar has represented to the EPA that a field application of metolachlor would be efficacious at a rate of seventy-five percent that which Syngenta's labeling recommended for years. Syngenta fears that the EPA's acceptance of that recommendation will be viewed by the market as an affirmation that Syngenta had long overstated the amounts necessary to effectively control weed populations and, thereby, price-gouged its customers.

In assessing the harm to the EPA should an injunction be issued, it is necessary to forecast the probable impact upon the agency's decisional process. Instead of allowing the EPA to finalize and announce its decision within the next four-

teen days[12] and then have the process of judicial review begin, Syngenta is asking that the Court infer from the February 28, 2002 memo, from the December 5, 2001 letter and from the March 4, 2002 letter that the EPA must have already made the decisions that Syngenta's S-metolachlor data is not eligible for exclusive use protection, that the data has been used to support Cedar's application, and that Cedar's application to register metolachlor has been granted. As requested, a preliminary injunction would compel one of two scenarios.

The first scenario would involve the Court's simply ordering the EPA to afford Syngenta the thirty-day notice under § 152.116(a). Assuming that the Court had the power on this record to make such an order and, further assuming that the EPA actually has determined but not announced a decision to register Cedar's metolachlor and to use Syngenta's metolachlor in support of the application to do so, an order would, at the least, deprive the agency of an opportunity to reflect upon and change important decisions prior to a public announcement relating to important statutory and regulatory interpretation— one of the very reasons undergirding the requirement that to be considered "final" an agency decision "must not be of a merely tentative or interlocutory nature" but "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178, 117 S.Ct. at 1168. At the most, if— as the government contends—there has not yet been a final decision, the agency will be deprived of its responsibility and right to make that decision: to exercise its

discretion in the definition of terms and the interpretation and application of regulations and the opportunity to do so in a timely manner.

A second possible scenario could involve an order requiring the EPA not to register Cedar's metolachlor unless it first afforded Syngenta the thirty-day notice discussed in § 152.116(a). This approach would also necessitate that the Court and not EPA define the term "eligible" in that section and also interpret the provisions of § 152.83(c)(2) with regard to whether the data in question met the definition of "exclusive use study," a question whose answer is dependent upon an interpretation whether the term "first registration" should or should not include the conditional registration of S-metolachlor. An affirmative answer might be applied to find that S-metolachlor would not be eligible for exclusive use protection. Again, a court's preemption of those decisions would deprive the EPA of its rights and responsibility to define non-Congressionally defined statutory terms (7 U.S.C. § 136a(c)(1)(F)(i)) and to define and apply the terms of the regulations (40 C.F.R. §§ 152.116(a) and 152.83(c)).

In balancing the harms, it is determined that the harm to EPA, should an injunction issue, outweighs that to Syngenta if one should not. First, EPA's decision might be that it is giving Syngenta thirty days notice of the intent to use its data in support of Cedar's application. Second, it might be that it has decided not to allow the Cedar application without obtaining more information. Should the EPA's decision be to use Syngenta's data in support

---

**12.** The earliest that the agency would act on Cedar's application would be fourteen days from March 4, 2002. The EPA represented to the Court that it might act on Cedar's application within seven to ten days after determining whether to cancel Syngenta's remaining metolachlor registration, which would occur no earlier than March 11, 2002. Thus, the earliest that the EPA would have initially acted on Cedar's application would have been fourteen days from March 4, 2002.

of the registration of metolachlor without giving Syngenta the thirty-day notice, Syngenta may then proceed to seek judicial review on an expedited basis by asking for preliminary relief. Should it be determined that the agency decision likely was based upon an unsupportable interpretation of applicable statutory or regulatory terms, a restraining order might then prevent Cedar's entry into the market. Without Cedar coming into the market, there is little likelihood that Syngenta's credibility will be affected at all. If Cedar should come into the market and its recommended application rate is not sufficient to control weed populations, it will take but a brief time for consumers to become aware of its inefficacy.

With the balance of hardships weighing decidedly in EPA's favor, Syngenta must show a strong likelihood of success on the merits. It cannot, however, be determined at this time what EPA's decision will be nor that it would necessarily be arbitrary if adverse to Syngenta.

While the public interest is always served by requiring governmental offices to perform their responsibilities properly, it cannot be found at this time that EPA will not do so. The timing is also of consequence to Cedar since the agronomic period for spraying preemergent herbicides such as metolachlor is from mid-March through early June.

Balancing the interests, it is determined that (1) even if there were subject matter jurisdiction, there has not been a sufficient showing to support the granting of a preliminary injunction nor (2) a stay or any other restraint pending appeal.

## IV.

For the reasons above, Syngenta's Motion for a Preliminary Injunction is DENIED, Syngenta's Motion for a Stay Pending Appeal is DENIED, and the temporary restraining order is DISSOLVED.

## ORDER

This case is before the Court on Plaintiff's Motion for Preliminary Injunction and request for a stay pending appeal. For the reasons set forth in the Memorandum Opinion, Plaintiff's Motion is DENIED. Furthermore, Syngenta's request for a stay pending appeal is DENIED and the temporary restraining order is DISSOLVED.